KATHLEEN WILDCATT v. JOHN LLOYD SMITH

No. 8330DC773

(Filed 19 June 1984)

**Indians § 1— judgment finding defendant in contempt for failure to pay child support—jurisdiction of state court as opposed to Court of Indian Offenses**

> A trial court erred in finding defendant in contempt and ordering him jailed until he paid $6,500 in arrearages for child support in 1983 where a default judgment was entered against defendant on 15 July 1980, but on 28 July 1980 the Cherokee Court of Indian Offenses began operation. Any exercise of state power after the creation of the Indian court system unduly infringed upon the tribe's asserted right of self-government.

> Judge JOHNSON concurring in the result.

APPEAL by defendant from *Snow, Judge.* Order entered 3 May 1983 in SWAIN County District Court. Heard in the Court of Appeals 2 May 1984.

Defendant appeals from a state court judgment holding him in contempt for failure to comply with a 1980 default judgment which required him to pay $200.00 per month to plaintiff for the support of the couple's two illegitimate children. Defendant contends that both the default judgment and the contempt order are void for lack of subject matter and personal jurisdiction.

Plaintiff's attempts to obtain child support from defendant began in April 1980 when she filed an action in Swain County District Court, seeking a determination of paternity and an award of child support. Defendant failed to file a timely answer and a de-

fault judgment was entered against him on 15 July 1980. On 28 July 1980 the Cherokee Court of Indian Offenses began operation and on 5 September 1980, plaintiff applied to the tribal court for enforcement of the state default judgment. The Court of Indian Offenses accorded full faith and credit to the state court judgment but that decision was reversed on 3 June 1981 by the Indian Appeals Court, which held that the state court lacked subject matter jurisdiction to enter the default judgment.

While the appeal was pending before the Indian Appeals Court, plaintiff filed a motion in Swain County District Court to hold defendant in contempt for failing to comply with the default judgment. Following a hearing on 3 February 1981, the trial court denied plaintiff's motion and also denied defendant's motion to set aside the 15 July 1980 default judgment for lack of personal and subject matter jurisdiction.

On 5 June 1981, two days after the decision of the Indian Appeals Court, plaintiff filed a new action against defendant in the Court of Indian Offenses, seeking an adjudication of paternity and an award of child support. Lengthy delays and attempts to settle the case followed, and when negotiations broke down, plaintiff filed another motion in Swain County District Court for enforcement of the initial default judgment. At a hearing on the motion on 3 May 1983, the trial court found defendant in contempt and ordered him jailed until he paid $6,500.00 in arrearages for child support. On 12 May 1983 plaintiff obtained a voluntary dismissal of the suit pending before the Court of Indian Offenses. From entry of the trial court order finding him in contempt, defendant appealed.

*Western North Carolina Legal Services, Inc., by Lawrence Nestler and James H. Holloway, for plaintiff.*

*Holt, Haire, Bridgers and Bryant, P.A., by Ben Oshel Bridgers, for defendant.*

WELLS, Judge.

This appeal raises for the first time the question of subject matter jurisdiction of our state courts over civil actions between members of the Eastern Band of Cherokees living on the reserva-

tion, following the recent creation of a tribal court system by the Eastern Band.[1]

It is axiomatic that personal and subject matter jurisdiction are essential prerequisites to entry of a valid court order. It is also beyond dispute that a defendant may challenge a court's subject matter jurisdiction at any stage of the proceedings, but may not raise the issue of personal jurisdiction for the first time on appeal. In the case at bar, defendant failed to make timely challenges to the personal jurisdiction of the state court in the 1980 default action and the 1983 contempt hearing; thus defendant's argument that the trial court lacked personal jurisdiction is overruled. Defendant's contention that the state court lacked subject matter jurisdiction and was thus powerless to enter either the 1980 default judgment or the 1983 contempt order requires more detailed discussion.

The general subject of Indian law is well beyond the scope of this opinion and we confine ourselves to the issue of jurisdiction over civil suits arising on tribal lands. A few well-established principles of law bear repeating at the outset, beginning with the proposition that federal power to regulate Indian affairs is plenary and supreme.[2] The states generally have only such power over Indian affairs on a reservation as is granted by Congress,[3] while

---

1. The Eastern Band had no court system of its own until the present decade, and members were forced to resort to state or federal courts to settle their disputes. By 1979, however, growing activism on the part of members of the Eastern Band, coupled with recognition by the state that it could no longer assert jurisdiction over felonies occurring on Indian reservations in the light of *United States v. John*, 437 U.S. 634 (1978), led to a request for federal permission to establish a tribal court system. Defendant's assertion that the North Carolina Attorney General issued a formal opinion withdrawing all state jurisdiction and law enforcement support from the reservation in response to *United States v. John, supra*, appears mistaken. Federal authorization for the tribal court system was granted in 1979, and the Cherokee Tribal Council responded on 10 July 1980, by enacting legislation creating the court system, and setting 28 July 1980 as the date for commencement of court operations.

2. *United States v. Mazurie*, 419 U.S. 544 (1975), S. Sherick, "State Jurisdiction Over Indians As A Subject of Federal Common Law: The Infringement-Preemption Test" 21 Ariz. L. Rev. 85 (1979), F. Cohen, *Handbook of Federal Indian Law*, 1982.

3. F. Cohen, *supra* n. 1, at 259, *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832).

the tribes retain powers inherent to a sovereign state, except as qualified and limited by Congress.[4]

To ask what entity possesses subject matter jurisdiction over a cause of action is to inquire about the way the power of governing has been allocated. The answer turns as much upon the history and political structures of our nation as upon legal theory in the area of Indian law, where tribes and the federal and state governments have all exercised varying degrees of sovereignty at different times. We turn therefore to an examination of the history of the relationship between the Eastern Band of the Cherokee and the state and federal governments for insight into the ways decision-making power has been distributed.

A detailed history of the Cherokees of North Carolina is set out in *The Cherokee Trust Funds*, 117 U.S. 288 (1886), *United States v. Wright*, 53 F. 2d 300 (4th Cir. 1931) and therefore we will not fully repeat those accounts here. It is sufficient to note that the Cherokee Indians were once one of several dominant Indian tribes occupying what is now North Carolina, South Carolina, Tennessee, Georgia and Alabama and that the tribes were sovereign entities with inherent powers to govern and settle disputes among their members, W. Canby, *American Indian Law* (1981). Upon the arrival of white settlers, the sovereignty of the tribes diminished, as first the British and then the United States governments asserted ownership of Cherokee lands. Under the Treaty of New Echota of 1835, the Cherokee Nation ceded all lands east of the Mississippi River to the United States and agreed to move west. About 1,200 Cherokees eluded the forced removal, however, and remained in North Carolina, where their rights and status were somewhat uncertain for many years. Following a rather complex series of land transactions, the Cherokee reservation, known as the Qualla Boundary lands, was established in western North Carolina. In 1924, pursuant to an act of Congress, 43 Stat. 376, the United States took title to the Cherokee land, holding those lands in trust for the benefit of the Eastern Band and placing certain restrictions upon alienation and taxation of the land, *United States v. Wright, supra.* The term of the trust relationship was extended indefinitely by the Indian Reorganization Act of 1934, 48 Stat. 984.

---

4. F. Cohen, *supra* n. 1, at 242, *United States v. Wheeler*, 435 U.S. 313 (1978).

The foregoing brief history of the Eastern Band sufficiently illustrates the drastic changes in the relationship between the Eastern Band and the state and federal governments. Before 1835, the North Carolina Cherokees were members of a separate, sovereign nation with inherent powers of self-government. By the terms of the Treaty of New Echota, the federal government, through its plenary power over Indians, provided that those Cherokees remaining in the state would thereafter be subject to state law. By 1868, the North Carolina Cherokees were accorded state citizenship.

Meanwhile, the Cherokees' relationship with the federal government continued to evolve as federal policies toward Indians changed. As early as 1868 Congress instructed the Secretary of the Interior to take "the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians."[5] Later acts of Congress also indicated that the Eastern Band had been accorded full tribal status by the federal government, despite the fact that tribal members were also citizens of North Carolina.[6]

Federal recognition of the Eastern Band as an Indian tribe has at least two major implications for the issue of state jurisdiction: (1) the federal government continues to maintain plenary power over the Eastern Band, a fact which strictly limits extensions of state power, *Williams v. Lee*, 358 U.S. 217 (1959), S. Sherick, "State Jurisdiction Over Indians As A Subject of Federal Common Law: The Infringement-Preemption Test," 21 Ariz. L. Rev. 85 (1979), and (2) the Eastern Band, like all recognized Indian

---

5. Act of 27 July 1868, 15 Stat. 228.

6. *See, e.g.,* Act of 4 June 1924, 43 Stat. 376, authorizing the federal government to hold the Cherokee lands in trust for the benefit of the members of the Eastern Band, thereby establishing the same relationship between the Eastern Band and the federal government as that between the federal government and other recognized tribes; 46 Fed. Reg. 35361, 8 July 1981, including the Eastern Band as among tribal entities which have a government-to-government relationship with the United States. The fact that the Eastern Band is a remnant of a larger group of Indians, that federal supervision over the tribe has not been continuous and that the Treaty of New Echota conferred state citizenship on the Eastern Band does not mean that the state may assume the federal government's plenary power to deal with Indians, *United States v. John, supra* n. 1 (asserting federal plenary power over the Mississippi Choctaw Indians, with a tribal history very similar to that of the Eastern Band).

tribes, possesses the status of a "domestic dependent nation"[7] with certain retained inherent sovereign powers, *accord, Eastern Band of Cherokee Indians v. Lynch,* 632 F. 2d 373 (4th Cir. 1980). These two principles also constitute the test for determining the scope of state court jurisdiction over members of an Indian tribe, referred to by some authorities as the infringement-preemption test.[8]

Under the preemption prong of the test, state power over Indian tribes is determined in light of the federal government's plenary power over all Indians. State regulations which conflict with federal enactments are void, and even if there is no directly conflicting federal enactment, state action may be barred if Congress has indicated an intent to "occupy the field" and prohibit parallel state action. S. Sherick, *supra* at 88. *See e.g., McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164 (1973).

If there is no applicable federal enactment, the state action must be examined under the infringement prong of the test, to determine if tribal sovereignty has been infringed upon. S. Sherick, *supra* at 87, F. Cohen, *Handbook of Federal Indian Law,* at 349-50 (1982).

In applying the infringement-preemption test to the facts before us, we turn first to examine the validity of the July 1980 default judgment. Defendant contends that by 1953 at the very latest, Congress had enacted legislation which preempted the field of Indian law and eliminated state court jurisdiction except as provided by the Act. Defendant contends that Public Law 280, codified at 18 U.S.C. § 1162 (1976 & 1983 Supp.); 28 U.S.C. § 1360 (1976 & 1983 Supp.) provides the exclusive method by which states can assume jurisdiction over Indians residing within their borders. Under the terms of P.L. 280, five states (later six), were

---

7. The term first appeared in *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1 (1831) and was apparently coined by Chief Justice Marshall. For a detailed discussion of the retained sovereign powers of Indian tribes, *see* W. Canby, *American Indian Law* (1981) and F. Cohen, *supra* at 229-52.

8. *See* S. Sherick, *supra.* The actual term "preemption" was first used in reference to Indian law in *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164 (1973), but the notions that federal law can preempt state legislation and that state law might be barred if it infringes upon tribal sovereignty appear in many earlier decisions. *See e.g., Williams v. Lee,* 358 U.S. 217 (1959).

Wildcatt v. Smith

automatically granted "jurisdiction over civil causes of action . . .
to which Indians are parties which arise in . . . Indian country
. . . to the same extent that such State . . . has jurisdiction over
other civil causes of action."[9] Section seven of the act, which has
since been repealed, permitted states other than the five which
were ordered to assume jurisdiction, to obtain jurisdiction by
legislative action if they so desired. North Carolina was not
among the states ordered to assume jurisdiction, nor has our leg-
islature acted to assume jurisdiction under section seven of the
act.

In 1968, the Indian Civil Rights Act[10] was enacted, permitting
states to assume jurisdiction over civil cases involving Indians
and arising in Indian country by consent of the tribe affected. The
Eastern Band has never given formal consent to the assumption
of state jurisdiction pursuant to the Indian Civil Rights Act,
*Sasser v. Beck,* 40 N.C. App. 668, 253 S.E. 2d 577, *disc. rev.
denied,* 298 N.C. 300, 259 S.E. 2d 915 (1979).

Defendant contends that passage of P.L. 280 and the Indian
Civil Rights Act preempted the entire field of state jurisdiction
over Indians, and that states which have not acted pursuant to
the federal legislation are without jurisdiction over civil cases
arising on reservations. The United States Supreme Court, how-
ever, has recently recognized that prior, lawfully assumed state
jurisdiction over some civil cases involving Indians survived the
passage of P.L. 280. In *Three Affiliated Tribes of the Fort Bert-
hold Reservation v. Wold Engineering,* --- U.S. ---, 52 U.S.L.W.
4647 (1984), the Court noted that "[n]othing in the language or
legislative history of Pub. L. 280 indicates that it was meant to
divest States of pre-existing and otherwise lawfully assumed
jurisdiction."[11]

---

9. 28 U.S.C. § 1360(a). States could also assume criminal jurisdiction pursuant
to P.L. 280, 18 U.S.C. § 1162.

10. 25 U.S.C. §§ 1301-1341 (1976 & 1983 Supp.). For a discussion of the Indian
Civil Rights Act, *see* F. Cohen, *supra* n. 1 at 666-670.

11. The Court's language in *Three Affiliated Tribes of the Fort Berthold
Reservation v. Wold Engineering,* --- U.S. ---, 52 U.S.L.W. 4647 (1984), while ad-
mittedly dicta, seems to indicate that the passage of P.L. 280 was not meant to
eliminate all state jurisdiction acquired outside the provisions of the act. After
stating the principle that prior, lawfully assumed state jurisdiction might survive

---

**Wildcatt v. Smith**

---

Plaintiff, on the other hand, contends that the state obtained jurisdiction over the Eastern Band pursuant to the Treaty of New Echota and that this jurisdiction was not divested by the passage of P.L. 280, the Indian Civil Rights Act, or any other action of Congress. We agree. The purpose[12] of P.L. 280 was to provide law enforcement for reservations which lacked adequate law enforcement and means of dispute settlement. At least through 1980, the members of the Eastern Band were free to avail themselves of the state courts for settlement of their disputes. We do not believe that Congress intended to preempt state court jurisdiction where the Indian tribe had no court system of its own. A rule holding that P.L. 280 was intended to cut off state jurisdiction over civil suits between reservation Indians which had no tribal court system would have had the opposite effect from that intended by Congress, by depriving the tribe of the state court forum, without providing an alternative. Our position is strengthened both by the language of *Wold, supra*, and by the failure of Congress to enact specific legislation barring assertion of North Carolina jurisdiction despite notice of the operation of state courts in this area for nearly thirty years.[13]

---

P.L. 280, the Court cautions that exercise of such jurisdiction will be improper where it would unduly infringe upon the tribe's right of sovereignty. The Court noted that "[a]s a general matter, tribal self-government is not impeded when a State allows an Indian to enter its courts on equal terms with other persons to seek relief against a non-Indian concerning a claim arising in Indian country. The exercise of state jurisdiction is particularly compatible with tribal autonomy when, as here, the suit is brought by the tribe itself and the tribal court lacked jurisdiction over the claim at the time the suit was instituted."

Judge Johnson's concurrence in our opinion interprets this language to mean that *P.L. 280 preempted prior state jurisdiction over cases in which all parties are Indians*, and that only cases involving a non-Indian could have survived passage of P.L. 280. We disagree. The foregoing language is not addressed to the preemptive effect of P.L. 280, but rather, the issue of what surviving state court jurisdiction may be exercised in light of the prohibition against infringement upon tribal authority. The answer must be reached by examining the facts of each case, including the nature of the state jurisdiction sought to be exercised and the degree of tribal autonomy, rather than a sweeping categorization based simply upon the tribal membership of the parties in a lawsuit.

12. *Bryan v. Itasca County*, 426 U.S. 373 (1976).

13. In *Washington v. Yakima Indian Nation*, 439 U.S. 463 (1979), the Yakima Indian Nation contended that the tribe's right of self-government, guaranteed by an 1855 federal treaty, must have continued after 1953 as it was not expressly abrogated by the terms of P.L. 280. The Court rejected the tribe's argument,

Decisions of the United States Supreme Court which seem to indicate that P.L. 280 and the Indian Civil Rights Act are the sole means by which a state may obtain jurisdiction over civil suits involving Indians are distinguishable on the grounds that none of the decided cases deal with an assertion of jurisdiction by a state pursuant to a treaty, over an Indian tribe without a tribal court system of its own.[14] A contrary rule, while perhaps under a literal interpretation of broadly-worded statutes, would serve neither

noting that "[a]lthough we have stated that the intention to abrogate or modify a treaty is not to be lightly imputed . . . this rule of construction must be applied sensibly. . . . To accept the Tribe's position would be to hold that Congress could not pass a jurisdictional law of general applicability to Indian country unless in so doing it itemized all potentially conflicting treaty rights that it wished to affect. This we decline to do. The intent to abrogate inconsistent treaty rights is clear enough from the express terms of Pub. L. 280." *Id.* at 478 n. 22.

We find nothing inconsistent with our holding today in the foregoing language of *Yakima Nation.* Applying P.L. 280's preemptive effect to the Yakima Nation only transferred dispute settlement from the tribe to the state courts. Application of P.L. 280 to the Eastern Band of the Cherokee before 28 July 1980 however would have left tribal members without a forum for civil cases arising between Indians on the reservation. Such a result cannot constitute a "sensible construction" of the effect of P.L. 280 upon the Treaty of New Echota.

14. For instance, in *Kennerly v. District Court of Montana,* 400 U.S. 423 (1971), a storeowner sued members of the Blackfeet Indian tribe on a debt arising from the Indians' purchase of groceries from a reservation store. The Supreme Court of Montana held that the state courts possessed subject matter jurisdiction, pursuant to a 1967 tribal law which provided for concurrent state and tribal jurisdiction over actions wherein the defendant was a member of the tribe. The United States Supreme Court reversed, on the ground that Montana had not acted to assume jurisdiction pursuant to P.L. 280. The Court noted that P.L. 280 made no provision for assumption of state jurisdiction by consent of the tribe, and that the Indian Civil Rights Act of 1968 permitted state jurisdiction with consent of the tribe only if consent was given by a majority vote of all members of the tribe.

In *Fisher v. District Court,* 424 U.S. 382 (1976), members of the Northern Cheyenne Tribe sought to adopt another member of the tribe who lived on the reservation. A tribal ordinance passed in 1966 purported to provide that the tribe had exclusive jurisdiction over cases involving adoptions of tribal members. The Montana Supreme Court disagreed, however, and held that the state court had subject matter jurisdiction over tribal adoption proceedings prior to 1935, when the Northern Cheyenne Tribal court and government was set up pursuant to federal law. The Montana court held that the unilateral tribal action could not divest the state court of jurisdiction. On appeal, the United States Supreme Court reversed, holding that the assertion of state court jurisdiction over tribal adoptions would unduly infringe upon tribal sovereignty. The Court held that even if Montana had possessed jurisdiction prior to 1935, its jurisdiction was preempted by the 1935 federal statute which permitted the Northern Cheyenne Tribe to set up its government and courts.

Wildcatt v. Smith

the congressional purpose behind P.L. 280 nor the ultimate welfare of the members of the Eastern Band, as it would require the invalidation of nearly thirty years of state court judgments voluntarily sought by members of the Tribe. We hold, therefore, that Congress has not preempted the field of state court assumption of subject matter jurisdiction over tribes which are without their own court system.

We turn now to the infringement prong of the test to determine if assertion of state jurisdiction in 1980 unduly infringed upon the Eastern Band's inherent right of self-government. While the Eastern Band has a great interest in regulating the domestic relations of its members, it does not appear to us that entry of the default judgment unduly infringed upon tribal sovereignty, as the tribe at that time had chosen not to exercise its rights of self-government in the area of dispute resolution. *See Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, supra.* Defendant's contention that the Swain County District Court lacked subject matter jurisdiction[15] to enter the 1980 default judgment must therefore be overruled.[15] *Accord, Little Horn State Bank v. Stops*, 170 Mont. 510, 555 P. 2d 211 (1976), *cert. denied*, 431 U.S. 924 (1977), *see also Sasser v. Beck, supra,* affirming the trial court's jurisdiction over a civil action occurring on the reservation, but failing to employ federal preemption doctrine analysis in reaching its results.[16] F. Cohen, *supra* at 350.

15. It is unclear whether the Court of Indian Offenses is required by federal law to accord full faith and credit to the valid 1980 state court judgment against defendant. Normally, under the Full Faith and Credit Clause of the United States Constitution, Art. IV § 1, states must recognize the laws and proceedings of sister states and the proper judgments of their courts. Congress has extended the application of the Full Faith and Credit Clause to United States territories and possessions by statute, but courts are divided over the question whether the doctrine applies to Indian tribes. *See* F. Cohen, *supra* at 384-85. Even in cases in which a court is not required to accord full faith and credit to the judgment of another court, the court may recognize the judgment under principles of comity, *Id.*

16. *Sasser v. Beck*, 40 N.C. App. 668, 253 S.E. 2d 577, *disc. rev. denied*, 298 N.C. 300, 259 S.E. 2d 915 (1979), appears to be the only other decision of our appellate courts dealing with the question of state court authority to hear civil cases arising on the reservation and involving a member of the Eastern Band, prior to establishment of the tribal court system. We do not decide today the impact of establishment of tribal courts upon the authority of state courts to hear criminal cases involving members of the Eastern Band. State courts asserted jurisdiction over criminal cases involving Indians prior to the establishment of the Indian

We now consider whether the state court retained jurisdiction to enforce the default judgment once the tribal court began operation on 28 July 1980. Plaintiff correctly notes that as a general rule, subject matter jurisdiction is determined when the initial complaint is filed, and later events do not deprive the court of jurisdiction. *In re Peoples*, 296 N.C. 190, 250 S.E. 2d 890 (1978), *cert. denied*, 442 U.S. 929 (1979), 20 Am. Jur. 2d *Courts* §§ 142, 148 (1965 & 1983 Supp.). It is also true that while a court loses jurisdiction over a cause after it renders a final decree, it retains jurisdiction to correct or enforce its judgment, *Whitmer v. Whitmer*, 243 Pa. Super. 462, 365 A. 2d 1316 (1976), *cert. denied*, 434 U.S. 822 (1977); *State ex rel. Taylor v. Carey*, 74 Mont. 39, 238 P. 597 (1925); 21 CJS *Courts* § 94 (1940 & 1983 Cum. Supp.). This general rule, however, is insufficient to override application of the infringement-preemption test to this case. *Accord Joe v. Marcum*, 621 F. 2d 358 (10th Cir. 1980).

We need not reach the issue whether state court jurisdiction was preempted by federal legislation after 28 July 1980, as the question before us may be resolved under the infringement prong of the test. It is clear that any exercise of state power after the creation of the Indian court system would unduly infringe upon the tribe's asserted right of self-government. *Williams v. Lee, supra.* Accordingly, we hold that the judgment of the Swain County District Court of 3 May 1983 must be reversed and remanded.

Reversed and remanded.

Judge BECTON concurs.

Judge JOHNSON concurs in the result.

Judge JOHNSON concurring in the result.

I concur in the reversal of the Swain County District Court order holding defendant in contempt for failure to comply with a

courts in the following cases: *State v. McAlhaney*, 220 N.C. 387, 17 S.E. 2d 352 (1941); *State v. Adams*, 213 N.C. 243, 195 S.E. 822 (1938); *State v. Wolf*, 145 N.C. 441, 59 S.E. 40 (1907); *State v. Ta-Cha-Na-Tah*, 64 N.C. 614 (1870); *State v. Dugan*, 52 N.C. App. 136, 277 S.E. 2d 842, *appeal dismissed*, 303 N.C. 711, 283 S.E. 2d 137 (1981).

1980 default judgment requiring him to pay child support for the parties' two illegitimate children. However, I do so on the ground that both the 1983 contempt order and the 1980 default judgment are void for lack of jurisdiction over the subject matter of the lawsuit. In my opinion, the majority's analysis of the scope of this state's judicial jurisdiction over members of an Indian tribe under the "infringement-preemption" test is flawed by the failure to recognize that Public Law 280, codified at 18 U.S.C. § 1162 (1976 & 1983 Supp.); 28 U.S.C. § 1360 (1976 & 1983 Supp.), has been repeatedly interpreted by the United States Supreme Court as a preemptive statute which provides the sole and exclusive means by which a state may assume effective jurisdiction over civil causes of action between members of an Indian tribe which arise in Indian country. Consequently, North Carolina's failure to acquire jurisdiction under the provisions of Public Law 280 has had the unavoidable consequence of leaving the courts of this state without effective jurisdiction over the conduct and activities of Cherokee Indians when they are within the confines of the Cherokee Indian Reservation.

At the outset, it must be remembered that although the subject of jurisdiction over Indian tribes is one in which "generalizations . . . have become particularly treacherous," *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed. 2d 114, 119 (1973), the decisions of the United States Supreme Court have established several basic principles with respect to the boundaries between state regulatory and jurisdictional authority and the right of tribal self-government. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed. 2d 665 (1980).

Although the Court early recognized that Indians and their lands constitute a sovereign and semi-independent entity, *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), the Court has long departed from the view of *Worcester* that the laws of a state can have "no force" within reservation boundaries. *White Mountain, supra.* Nevertheless, the Court has continued to recognize that the Indian tribes retain "attributes of sovereignty over both their members and their territory." *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed. 2d 706, 716 (1975).

The status of the tribes has been described as " 'an anomalous one and of complex character,' " for despite their partial assimilation into American culture, the tribes have retained " 'a semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' " *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 173, [93 S.Ct. 1257, 1263, 36 L.Ed. 2d 129, 136] (1973), *quoting United States v. Kagama*, 118 U.S. 375, 381-382, [6 S.Ct. 1109, 1112-1113, 30 L.Ed. 228, 230] (1886).

*White Mountain, supra,* at 142, 100 S.Ct. at 2583, 65 L.Ed. 2d at 672.

Federal power over Indians is usually described as "plenary," and its source is most often discussed in court opinions by reference to three constitutional provisions: the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3; the Treaty Clause, U.S. Const. art. II, § 2, cl. 2; and the Supremacy Clause, U.S. Const. art. VI, cl. 2. *See generally* F. Cohen, *Handbook of Federal Indian Law*, 207-212 (1982). "For most purposes it is sufficient to conclude that there is a single 'power over Indian affairs,' an amalgam of the several specific constitutional provisions." *Id.* at 211.

This broad congressional power to regulate tribal affairs and the "semi-independent position" of Indian tribes has given rise to the two independent, but related barriers to the assertion of state regulatory and adjudicatory authority over tribal reservations and members—preemption of state authority by federal law and unlawful infringement on "the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed. 2d 251, 254 (1959). Consequently, "[t]he right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop' . . . against which the vague or ambiguous federal enactments must always be measured." *White Mountain, supra* at 143, 100 S.Ct. at 2583, 65 L.Ed. 2d at 672. (Citation omitted.)

F. Cohen, in his *Handbook of Federal Indian Law, supra,* at 349, has summarized relevant principles for determining the extent of state jurisdiction over Indian defendants within Indian country absent federal delegation.

> Within Indian country state jurisdiction is preempted both by federal protection of tribal self-government [*McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164 (1973)] and by federal statutes on other subjects relating to Indians, tribes, their property, and federal programs [*United States v. Mazurie,* 419 U.S. 544 (1975)]. Federal protection of tribal self-government precludes either criminal or civil jurisdiction of state courts over Indians or their property absent the consent of Congress [*United States v. John,* 437 U.S. 634 (1978); *Fisher v. District Court,* 424 U.S. 382 (1976)] . . . State jurisdiction is precluded even over what are commonly designated as transitory causes of action. (Footnotes omitted.)

## I

The majority's conclusion that the 1980 default judgment was valid when entered rests upon the assumption that the state obtained jurisdiction over the Eastern Band pursuant to the Treaty of New Echota, 7 Stat. 478 (1835), and that this jurisdiction was not divested by the passage of Public Law 280, the Indian Civil Rights Act, 25 U.S.C. §§ 1301-1341 (1976 & 1983 Supp.) or any other act of Congress. Thus, the threshold issue raised by this appeal is whether the legal status of the members of the Eastern Band of Cherokees differed materially from that of other federally recognized Indian tribes at the time Public Law 280 was enacted.

Historically, the federal government has determined that certain groups of Indians will be recognized as tribes for various purposes, incident to the Indian Commerce Clause of the Constitution. When Congress or the Executive has found that a tribe exists, courts will not normally disturb such a determination. F. Cohen, *supra,* at 3. The Fourth Circuit Court of Appeals recently addressed the issue of the legal status of the Eastern Band under the Treaty of New Echota with respect to the right of North Carolina to impose a tax on income earned by members of the Eastern Band on the reservation and upon their personal property on the reservation. *Eastern Band of Cherokee Indians v.*

*Lynch*, 632 F. 2d 373 (4th Cir. 1980). In *Lynch*, no federal statute expressly preempted the state's authority to impose the subject taxes; however, no federal statute expressly permitted the state to levy the taxes. The court first reviewed the course of the Eastern Band's relationship to the state of North Carolina and to the United States from the eighteenth to the early twentieth century, *Id.* at 375-377, and concluded that since the passage of the Indian Reorganization Act of 1934, 48 Stat. 984, Congress has consistently referred to the Eastern Band property as the "Cherokee Indian Reservation" or the "Eastern Cherokee Reservation." 632 F. 2d at 377.

> Relevant opinions of the Department of Interior's Solicitor have stressed that despite the state citizenship of tribe members, the federal government has treated the Eastern Band "in every respect" as an Indian tribe, and the lands held in trust as an Indian reservation. (Footnotes omitted.)

*Id.*[1]

Next, the court reviewed its own opinions since 1934, which have all acknowledged federal guardianship over the Band.

> We have held that federal law preempts North Carolina jurisdiction over proceedings affecting the trust lands, and we have refused to apply North Carolina adverse possession laws to suits involving the reservation. We have also rejected contentions that the Eastern Band is not an Indian tribe and that the land it occupies is not an Indian reservation within the meaning of federal Indian trading statutes. We have held that the right to sue the Eastern Band is dependent upon the consent of the United States, and we have recognized that Congress has not conferred jurisdiction on federal courts to monitor tribal elections. Finally, we have found that federal preemption bars North Carolina from enforcing its fishing license requirement against non-Indian fishermen on the Band's reservation. (Footnotes omitted.)

632 F. 2d at 377-378.

---

1. For an extensive examination of the legal status of the Eastern Band, *see* Bridgers, *An Historical Analysis of the Legal Status of the North Carolina Cherokees*, 58 N.C. L. Rev. 1075 (1980).

**Wildcatt v. Smith**

The Court summarized its historical examination of the Band's legal status as follows:

> This abridged history demonstrates that the Act of 1924 [which included the Eastern Band property in the federal allotment program] significantly altered the relationship of the Band both to North Carolina and to the United States. After the 1924 conveyance in trust, notwithstanding the earlier history of the Eastern Band, the relationship of the United States to both the Band and the land upon which its members reside mirrored the relationship of the United States to the large number of tribes and reservations included in the General Allotment Act of 1887. [Par.] We repeat what our cases have decided: the members of the Eastern Band of Cherokees have a dual status. They are citizens of North Carolina. Nevertheless, they are a federally recognized Indian tribe, and the land on which they earn their livelihood is a federally recognized Indian reservation held in trust for their benefit by the United States.

*Id.* at 378.

The *Lynch* court then set about to reconcile the problem of the dual status of the members of the Eastern Band with North Carolina's claim that the Treaty of New Echota established the state's right to impose the taxes at issue. The court first stated that the governing principle in the analysis of the status of Indians who were both citizens of North Carolina and also Indians living on an Indian reservation held in trust by the United States for their benefit was that the Constitution, treaties and federal laws pertaining to Indians are preeminent, *citing Worcester v. Georgia, supra.* On the basis of the rationale developed by the United States Supreme Court in *United States v. John,* 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed. 2d 489 (1978), for reconciling the problem of dual status Indians with state claims of jurisdiction, the *Lynch* court rejected North Carolina's argument that the Treaty of New Echota established the state's right to impose the income and personal property taxes at issue. The court then held that the members of the Eastern Band were not required to show express federal exemption from state taxation to avoid imposition of the disputed taxes and that the lack of congressional consent to impose an income or personal property tax on members of the East-

ern Band precluded the levy of such taxes by North Carolina. In other words, federal preemption, standing alone, was found to be a sufficient bar to the state's authority to levy the taxes at issue. 632 F. 2d at 381, n. 40.

The holding in *Lynch* is premised upon the court's conclusion that it is the *current status* of the Eastern Band as a federally recognized tribe residing on an Indian reservation, rather than their North Carolina citizenship which determines the state's power to tax. 632 F. 2d at 380, *citing by implication, Moe v. Salish & Kootenai*, 425 U.S. 463, 467, 96 S.Ct. 1634, 1638, 48 L.Ed. 2d 96, 103 (1976) (Montana not permitted to levy a personal property tax on automobiles owned by reservation Indians despite Court's acknowledgment that the Indians were citizens of Montana). This conclusion was reached under the rationale developed in *United States v. John, supra*, in which the United States Supreme Court rejected Mississippi's claim of jurisdiction to try a Choctaw Indian for a crime committed on the Choctaw Reservation under the Treaty at Dancing Rabbit Creek, 7 Stat. 333 (1830). As the *Lynch* Court noted, the history of the Choctaws' relationship to Mississippi and the federal government "remarkably parallels that of the Eastern Band." 632 F. 2d at 378. Because of its direct bearing on the case under discussion, a brief examination of the *John* opinion is necessary.

The issue before the Court in *John* was whether the federal government had exclusive jurisdiction over a Choctaw Indian pursuant to 18 U.S.C. §§ 1151 and 1153, for a criminal offense committed on the Choctaw reservation. 18 U.S.C. § 1153 makes any Indian who commits certain specified offenses (major crimes) within "Indian country" subject to the exclusive criminal jurisdiction of the United States. 18 U.S.C. § 1151 defines "Indian country" to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." It is of note here that this definition of "Indian country" is also used for purposes of civil jurisdiction. *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed. 2d 300 (1975).

In *John*, Mississippi contended that the Choctaw reservation was not "Indian country" because (1) the Choctaws of Mississippi were merely a remnant of a larger group of Indians, long ago removed from Mississippi, (2) federal supervision over the Choc-

taws had not been continuous, and (3) the Treaty at Dancing Rabbit Creek extended state citizenship to Choctaws who remained in Mississippi. The Supreme Court rejected each of the state's contentions and held that the federal statutes operated to vest exclusive jurisdiction in the federal courts and precluded the exercise of state criminal jurisdiction over the enumerated offenses committed on the Choctaw lands, despite the earlier history of the tribe.

That history may be summarized as follows: In 1830, the Choctaw Nation entered into the Treaty at Dancing Rabbit Creek, which ceded to the United States all lands east of the Mississippi still occupied by the Choctaws and stipulated that the Nation would remove to lands west of the river. As with the Treaty of New Echota, the Treaty at Dancing Rabbit Creek provided that the Indians who remained in the east could become citizens of their respective states. Federal supervision over those Choctaws who remained in Mississippi, which was not continuous during the nineteenth century, was resumed in the early twentieth century; lands were then purchased, an allotment program instituted; and, as with the Eastern Band, the United States eventually took title in trust for all lands originally purchased for the Mississippi Choctaws.

The Supreme Court's rejection of Mississippi's jurisdictional claims on the basis of the tribe's state citizenship is directly relevant to the issues in the case under discussion. As to the historical justification given for Mississippi's assertion of jurisdiction over the tribe and its lands, the Court stated:

> We assume for purposes of argument, as does the United States, that there have been times when Mississippi's jurisdiction over the Choctaws and their lands went unchallenged. But, particularly in view of the elaborate history, recounted above, of relations between the Mississippi Choctaws and the United States, we do not agree that Congress and the Executive Branch have less power to deal with the affairs of the Mississippi Choctaws than with the affairs of other Indian groups. Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal

power to deal with them. *United States v. Wright,* 53 F. 2d 300 (CA4 1931), *cert. denied,* 285 U.S. 539, [52 S.Ct. 312, 76 L.Ed. 932] (1932).

437 U.S. at 652-653, 98 S.Ct. at 2551, 57 L.Ed. 2d at 502.

The court then addressed the state's argument that the assertion of exclusive criminal jurisdiction over the Choctaws by the federal government would be inconsistent with the terms of the Treaty at Dancing Rabbit Creek whereby the Mississippi Choctaws became state citizens:

> *This argument may seem to be a cruel joke to those familiar with the history of the execution of that treaty, and of the treaties that renegotiated claims arising from it. . . .* And even if that treaty were the only source regarding the status of these Indians in federal law, we see nothing in it inconsistent with the continued federal supervision of them under the Commerce Clause. It is true that this treaty anticipated that each of those electing to remain in Mississippi would become "a citizen of the States," but the extension of citizenship status to Indians does not, in itself, end the powers given Congress to deal with them. (Citations omitted and emphasis added.)

437 U.S. at 653-654, 98 S.Ct. at 2551, 57 L.Ed. 2d at 502-503. Since the statute providing a basis for the federal prosecution of the defendant is *John* is ordinarily preemptive of state jurisdiction when it applies, Mississippi was precluded from exercising its jurisdiction over the Indian defendant for the same offense, despite the "dual status" of the Choctaws.

As the Fourth Circuit Court of Appeals recognized in *Lynch,* it is evident that the rationale of *John* is controlling on the question of whether the 1835 Treaty of New Echota immutably fixed the dominion of North Carolina over the Eastern Band in the face of subsequent federal statutes. 632 F. 2d at 380. The answer under *John* is emphatically that it did not. The Supreme Court's phraseology in rejecting Mississippi's jurisdictional claim under the Treaty at Dancing Rabbit Creek as a "cruel joke" leads to no other conclusion.

Taken together, *Lynch* and *John* establish the following principles with regard of the "dual status" of the Eastern Band:

1. By virtue of the 1835 Treaty of New Echota, the Eastern Band of Cherokees are citizens of North Carolina.

2. They are, nevertheless, a federally recognized Indian tribe, living on an Indian reservation held in trust by the United States for their benefit. Act of June 4, 1924, 43 Stat. 376; Act of June 18, 1934, 48 Stat. 984.

3. Neither the fact that at times the State's exercise of jurisdiction over the Indians and their land went unchallenged, nor the fact that federal supervision over the particular Indian group has not been continuous, destroys the preeminent federal power to deal with them.

4. Jurisdictional controversies between the states and Indian tribes having a "dual status" deriving from early treaties of removal are to be resolved by looking at the current status of the Indians under federal Indian law; the dominion of North Carolina over the Eastern Band, established by the 1835 Treaty of New Echota is not immutable.

From the foregoing discussion it is evident that despite the earlier history of the Eastern Band, the federal government's resumption of supervision over their affairs in the late nineteenth and early twentieth centuries must be considered determinative of their legal status as a federally recognized Indian tribe. The relationship of the United States to both the Band and the land upon which it resides, then, had not materially differed from the federal government's relationship with other Indian tribes by 1934, or at the latest, by the time of the codification of Title 18 in 1948, which by definition, had the effect of reconstituting the Eastern Band reservation as "Indian country," 18 U.S.C. § 1151, "under the jurisdiction of the United States Government," for purposes of the Major Crimes Act, 18 U.S.C. § 1153. As noted above, this definition is also used for purposes of civil jurisdiction. *DeCoteau v. District County Court, supra.*

Having concluded that the federal supervisory authority over the Eastern Band was neither terminated nor diminished by the Treaty of New Echota, and that their legal status did not differ materially from that of other Indian tribes, the question then becomes whether the enactment of Public Law 280 in 1953 had the effect of preempting North Carolina's jurisdiction over civil

causes of action arising between members of the Eastern Band with regard to on-reservation conduct. I find no indication, in either the statutory language itself, the legislative history, or in recent Supreme Court cases interpreting Public Law 280, that Congress intended to exempt North Carolina from the preemptive operation of the statute.

## II

Again, in resolving the issue of whether the passage of Public Law 280 and the Indian Civil Rights Act preempted the entire field of state jurisdiction over Indian parties for on-reservation conduct, it must be remembered that "[t]he unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of preemption that have emerged in other areas of the law." *White Mountain, supra,* at 143, 100 S.Ct. at 2583, 65 L.Ed. 2d at 672. Furthermore, "[t]he tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been preempted by operation of federal law." *Id.* "Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Id.* at 143-144, 100 S.Ct. at 2584, 65 L.Ed. 2d at 673. It is with these principles in mind that Public Law 280 must be examined.

## A

Public Law 280 was the first federal jurisdictional statute of general applicability to Indian reservation lands. *See* Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians,* 22 UCLA L. Rev. 535 (1975). By its terms, the Act effected the immediate cession of criminal and civil jurisdiction over Indian country to five states, with an express exception for the reservations of certain tribes within those states. Public Law 280, §§ 2 and 4. North Carolina was not among the states given immediate jurisdiction.

Two separate provisions of Public Law 280 are potentially applicable to states not granted immediate jurisdiction. The first, Section 6, not applicable to North Carolina, covers states whose constitutions or enabling statutes contained organic law disclaimers of jurisdiction over Indian country. The people of those states were given permission to amend "where necessary" their state

---

---

constitutions or existing statutes to remove any legal impediment to the assumption of jurisdiction under the Act. As the Supreme Court has observed, "*All* others were covered in § 7." *Washington v. Yakima Indian Nation*, 439 U.S. 463, 474, 99 S.Ct. 740, 748, 58 L.Ed. 2d 740, 752 (1979) (emphasis added).

Section 7, by its terms, gave the remaining states an option to assume ·jurisdiction over criminal offenses and civil causes of action in Indian country without consulting with or securing the consent of the tribes that would be affected.[2] Section 7 provides in full as follows:

> The consent of the United States is hereby given to *any other State not having jurisdiction* with respect to criminal offenses or civil causes of action, or with respect to both, *as provided for in this Act*, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof. (Emphasis added.)

As the majority noted, North Carolina has not assumed jurisdiction over the Eastern Band by affirmative legislative action under Section 7. The language of Section 7 is clear and unambiguous. *Any* other state not having jurisdiction "as provided for in this Act"—that is, not acquiring immediate jurisdiction under Sections 2 and 4, and not falling under the coverage of Section 6—was given the consent of Congress to assume jurisdiction "by affirmative legislative action." No state, including North Carolina, was expressly exempted from the operation of this, or any other provision of the Act. Where Congress did intend to exempt certain reservations within the mandatory states, it specifically mentioned those reservations in the Act itself. *See* Sections 2 and 4. Therefore, the statutory language supports the conclusion that Congress intended Public Law 280 to preempt the entire field of state court civil jurisdiction over actions between Indians. Accordingly, the mode of procedure established by Section 7 is the exclusive means by which North Carolina could have acquired such civil jurisdiction, prior to 1968.

---

2. Section 7, for this reason, was much criticized and was eventually repealed. The 1968 Indian Civil Rights Act, codified at 25 U.S.C. §§ 1301-1341 (1976 & 1983 Supp.), provided that states could assume jurisdiction over cases involving Indians and arising in Indian country only by consent of the tribe affected.

Additional textual support for this construction of Public Law 280 may be gleaned from the provisions limiting the scope of civil jurisdiction ceded by the Act to both the mandatory and optional states. Subsections (b) and (c) of Section 4 limit, respectively, a state's ability to regulate certain property and water rights, land use, and probate matters within Indian country, and the choice of law in civil cases brought to state court. Subsection (c) states:

> Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.

The placement of these restrictions on the scope of the civil jurisdiction ceded by Public Law 280 argues against the conclusion that any state was impliedly exempted from the operation of the Act, because such a state would not be subject to these limitations in the exercise of its civil jurisdiction. In discussing this provision, F. Cohen, *supra*, at 344 states:

> The civil law provisions of Public Law 280 expressly preserve the legislative authority of tribes where not inconsistent with applicable state civil law. The wording of the section shows that its purpose is to require that such tribal laws be recognized in state courts. . . .

It appears unlikely, given the federal policy of encouraging tribal self-government embodied in these restrictions on state jurisdiction, that Congress would have intended the anomalous result of leaving North Carolina totally unrestricted with regard to its civil jurisdiction.

Furthermore, I am unpersuaded by the majority's reasoning that the state's assertion of jurisdiction pursuant to the Treaty of New Echota was completely unaffected by the enactment of Public Law 280. The identical argument was put forth by the Yakima Indian Nation in *Washington v. Yakima Indian Nation, supra,* and summarily rejected by the Supreme Court. The primary issue before the Court in that case was whether Washington was required to amend its constitution before it could validly legislate under

the authority of Public Law 280. The Tribe argued, *inter alia*, that under its 1855 Treaty with the United States, Act of June 9, 1855, 12 Stat. 951, it was guaranteed a right of self-government that was not expressly abrogated by Public Law 280. The Court's rejection of this argument is directly relevant to the assertion of North Carolina's purported jurisdiction pursuant to the Cherokees' 1835 Treaty with the United States and it bears repetition in full:

> The argument assumes that under our cases . . . treaty rights are preserved unless Congress has shown a specific intent to abrogate them. Although we have stated that the intention to abrogate or modify a treaty is not to be lightly imputed . . . This rule of construction must be applied sensibly. In this context, the argument made by the Tribe is tendentious. *The treaty right asserted by the Tribe is jurisdictional. So also is the entire subject-matter of Pub. L. 280. To accept the Tribe's position would be to hold that Congress could not pass a jurisdictional law of general applicability to Indian country unless in so doing it itemized all potentially conflicting treaty rights that it wished to affect. This we decline to do. The intent to abrogate inconsistent treaty rights is clear enough from the express terms of Pub. L. 280.* (Citations omitted and emphasis added.)

439 U.S. at 478, n. 22, 99 S.Ct. at 750, 58 L.Ed. 2d at 754.

Therefore, it appears that the Supreme Court has already resolved the issue of whether Congress intended to abrogate inconsistent treaty rights and provisions of a jurisdictional nature by the enactment of Public Law 280. The conclusion reached is consistent with the Court's more general statements. Public Law 280 is a preemptive jurisdictional act of *general applicability* which abrogated all potentially conflicting treaty rights by its *express terms.* In light of the general rule of construction applicable to congressional statutes claimed to terminate Indian immunities—that doubts be resolved in favor of tribal self-government, *see, e.g., White Mountain, supra*—the Court's ready imputation of a congressional intention to abrogate prior treaties from the express terms of Public Law 280 alone is particularly significant. This is so because the effect of imputation in that case was to abrogate the Yakima Nation's right to self-government. The

Court's holding in *Yakima Indian Nation* would, therefore, appear to be determinative of North Carolina's jurisdictional claims pursuant to the Treaty of New Echota following the enactment of Public Law 280 in 1953. Any inconsistent Treaty provision was simply abrogated and Section 7 of Public Law 280 became the determinative jurisdictional statute under federal law.

B

The appellee, in her brief, contends that the legislative history of Public Law 280 substantiates North Carolina's claim of civil jurisdiction over the Eastern Cherokee Indians. Much has been written about the legislative history of Public Law 280. *See, e.g.*, Goldberg, *supra*. The primary thrust of Public Law 280 was directed toward the problem of criminal law enforcement and "[m]ost likely, civil jurisdiction was an afterthought in a measure aimed primarily at bringing law and order to the reservations." *Id.* at 543. In *Washington v. Yakima Indian Nation, supra*, the Court discussed the legislative history of Public Law 280 at great length. The Act developed from a bill to confer jurisdiction on California, H.R. 1063, to a series of individual bills to transfer jurisdiction to the "five willing states" which eventually were covered in Sections 2 and 4. It was then transformed into a bill of "general applicability." Section 6, discussed earlier, was added to accommodate states with constitutional prohibitions against jurisdiction.

> Public Law 280 was the first jurisdictional bill of general applicability ever to be enacted by Congress. It reflected congressional concern over law-and-order problems on Indian reservations and the financial burdens of continued federal jurisdictional responsibilities on Indian lands . . . It was also, however, without question reflective of the general assimilationist policy followed by Congress from the early 1950's through the late 1960's . . . (Citations and footnotes omitted.)

439 U.S. at 488, 99 S.Ct. at 755, 58 L.Ed. 2d at 760.

As the Court noted in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed. 2d 710 (1976), there is a virtual absence of expression of congressional policy or intent respecting Section 4's grant of civil jurisdiction to the States.

[T]he primary intent of § 4 was to grant jurisdiction over private civil litigation involving reservation Indians in state court. [Par] Furthermore, certain tribal reservations were completely exempted from the provisions of Pub. L. 280 precisely because each had a "tribal law-and-order organization that functions in a reasonably satisfactory manner." H.R. Rep. No. 848, p. 7, [U.S. Code Cong. & Admin. News 1953, p. 2413]. Congress plainly meant only to allow state courts to decide criminal and civil matters arising on reservations not so organized. (Footnotes omitted.)

*Id.* at 385-386, 96 S.Ct. at 2109, 48 L.Ed. 2d at 719.

In *Bryan*, the grant of jurisdiction under Section 4 of Public Law 280 was construed narrowly to preclude state taxing authority. The Court reasoned that the extension of the civil jurisdiction of the states to Indian reservations did not expressly include the power to tax; that such an extension would have the effect of undermining tribal government; and that "courts 'are not obliged in ambiguous instances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship.'" *Id.* at 388, n. 14, 96 S.Ct. at 2111, 48 L.Ed. 2d at 721, *quoting with approval, Santa Rosa Band of Indians v. Kings County,* 532 F. 2d 655, 663 (9th Cir. 1975). The Court also observed that "[T]he same Congress that enacted Pub. L. 280 also enacted several termination Acts—legislation which is cogent proof that Congress knew well how to express its intent directly when that intent was to subject reservation Indians to the full sweep of state laws and state taxation." *Id.* at 389, 96 S.Ct. at 2111, 48 L.Ed. 2d at 721.

It is evident then, that Public Law 280 is to be narrowly and literally construed in light of evolving federal Indian policy. As was stated in Part I, the language of Public Law 280 regarding those states receiving congressional consent to assume jurisdiction under Section 7 is clear and comprehensive; "any other State not having jurisdiction . . . as provided for in this Act." No state, including North Carolina, was expressly exempted from compliance with either Section 6 or Section 7. Inasmuch as the Act contained specific exemptions for reservations within the states granted immediate jurisdiction, it is reasonable to infer that

where Congress intended either to include a specific reservation or State or to exempt one from Public Law 280, it did so by express provision. Therefore, I cannot agree with the majority's holding that North Carolina was impliedly exempt from the preemptive operation of the Act.

The appellee, approaching the issue from a different perspective, contends that the explanation for Congress' failure to include North Carolina among the states given immediate jurisdiction under the Act is contained in the testimony of representatives of the Bureau of Indian Affairs during the Hearings on Public Law 280 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess. (June 29, 1953). Appellee has supplied the full transcript of the Hearing on June 29, 1953 as an appendix to her brief.[3]

The transcript contains two direct references to the jurisdictional situation with respect to North Carolina. The first is as follows:

Mr. Shuford. What is the situation with regard to North Carolina?

Mr. Benge. I believe that the situation in North Carolina is that there is a federal court decision holding that the Indian reservation there, the Eastern Cherokee Reservation, is under the state law and order jurisdiction.

Mr. Shuford. I was under the impression they did have such an arrangement.

Mr. Benge. I think in 1933 there was a decision by the Circuit Court of Appeals for that circuit which held the reservation to be under the state jurisdiction. I know at the present time the sheriff does some work on the reservation. The tribe

---

3. *See Washington v. Yakima Indian Nation,* 439 U.S. at 490, n. 35, 99 S.Ct. at 756, 58 L.Ed. 2d at 762, for a list of the primary legislative materials on Public Law 280. The transcripts of the Hearings on H.R. 1063 (the consolidated jurisdictional bill) were apparently not published in reported form. A transcript of the subsequent Hearings on H.R. 1063 before the House Committee on Interior and Insular Affairs 83d Cong., 1st Sess. (July 15, 1953) was not supplied to this Court.

hires some officers, and they take all their cases into the JP court in Bryson City.

Mr. Shuford. They also have a federal court where they try Indian cases.

Mr. Benge. Yes, sir; they have some Indian cases in the federal courts there.

Mr. Shuford. Could you give me the citation on that?

Mr. Benge. I do not have it with me, Congressman, but I can get it for you.

Hearings on H.R. 1063 Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess. 24-25 (June 29, 1953). The "1933 decision" referred to could only have been *United States v. Wright*, 53 F. 2d 300 (4th Cir. 1931), *cert. denied*, 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932 (1932).[4]

Appellee argues that the foregoing testimony, together with the subsequent passage of Public Law 280 without inclusion of North Carolina among the mandatory states, indicates that Congress must have decided that North Carolina was already exercising effective jurisdiction over the Eastern Band and it was, therefore, unnecessary to include North Carolina among the states given immediate jurisdiction.

The second mention of North Carolina in the Hearings, however, tends to undermine this somewhat speculative interpretation. After an exchange on the fact that this was to be "a general bill," the following testimony appears:

---

4. In *Wright*, the Fourth Circuit Court of Appeals undertook an extensive review of the history of the Eastern Band and its relation to the state and federal governments up to 1931. The court first determined that "there can be no doubt that Congress has the power to legislate for the protection of the Eastern Band of Cherokee Indians and for the regulation of the affairs of the band," 53 F. 2d at 307, and then upheld the constitutionality of the Cherokee Allotment Act, Act of June 4, 1924, 43 Stat. 376, which, *inter alia*, exempted the land conveyed therein from taxation by North Carolina while it was held in trust for the Band by the federal government. Although the decision was based upon the court's determination that the North Carolina "citizenship of the Indians does not affect the power of the [federal] government to exercise guardianship over them," 53 F. 2d at 312, the court also observed *in dictum*, that "the numbers of the band, by separation from

Mr. Shuford. Mr. Chairman, I would like to be sure about North Carolina, because I think North Carolina might be brought in on that.

Mr. Benge. There does seem to be some question, Congressman, as to whether or not the codification of Title 18 in 1948 reconstituted the reservation as "Indian country" so as to deny state jurisdiction.

Mr. Shuford. I know they do maintain a deputy sheriff on the reservation.

Mr. Benge. Yes, sir.

Mr. Shuford. Whether that is by comity I do not know.

Mr. Benge. It is not clear legally whether the court decision to which I referred is now the law, or whether it is now "Indian country" under Title 18.

Mr. Shuford. Will you advise me about that?

Mr. Benge. Yes, I will.

Mr. D'Ewart. I move the adoption of the motion.

Hearings on H.R. 1063 Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess. 26 (June 29, 1953).

The subcommittee then voted to report favorably to the Full Committee on H.R. 1063, as amended to cover the mandatory states and all other states.

It is simply not possible to draw any reliable conclusions on the basis of these materials. First, it is clear that at both points in

---

the original tribe, have become subject to the laws of the state of North Carolina; and clearly no act of Congress in their behalf would be valid which interfered with the exercise of the police power· of the state." 53 F. 2d at 307. The court further stated that any such act of Congress must bear a reasonable relation to the *economic welfare* of the tribe, *i.e.*, to the purpose for which the federal government exercises guardianship and protection over a people subject to the laws of one of the states. This unduly narrow view of the well-established "plenary power" of Congress to enact legislation dealing with the Indian tribes is of questionable validity as a matter of constitutional law. More importantly, for the purpose of this appeal, it is impossible to determine how the seemingly contradictory statements contained in *Wright* would be interpreted by the representatives considering the jurisdictional question.

the relevant testimony, questions were raised as to the source and continued vitality of North Carolina's exercise of jurisdiction, and no further transcripts indicating the resolution of these issues have been submitted by the appellee. Secondly, an independent examination of the Fourth Circuit Court of Appeals opinion in *United States v. Wright, supra* at note 5, indicates that the thrust of that decision was that federal supervisory authority over the Eastern Band was undiminished by the fact of state citizenship and the references to the Band's being politically subject to the laws of the ·state were *dicta*. In addition, as the *Lynch* Court pointed out: Since passage of the 1934 Indian Reorganization Act, the Cherokee lands have been recognized as constituting a "reservation" and the Department of Interior's Solicitor's opinions, dating at least since 1942, indicate that the federal government has treated the Eastern Band "in every respect" as an Indian tribe and the lands held in trust as an Indian reservation. 632 F. 2d at 377, n. 22. Finally, the conclusion of the House Report on H.R. 1063 as amended, H.R. Rep. No. 848, 83d Cong., 1st Sess., *reprinted in* 1953 U.S. Code Cong. & Ad. News 2409, indicates that with the exception of the five states expressly mentioned in Sections 2 and 4 of the Act, and some eight states whose enabling acts and constitutions contain express disclaimers of jurisdiction over Indian reservations, the Interior Department "does not have information on the attitude and disposition of the State and local authorities and the Indian groups in the [other] States." *Id.* at 2414.

Again, the legislative history of Public Law 280 with regard to North Carolina is somewhat ambiguous and inconclusive and does not, therefore, substantiate the state's jurisdictional claim as the appellee contends. It reflects only an awareness in the subcommittee that North Carolina stood in a somewhat unique position with respect to the jurisdictional question, and a definite congressional intent to make Public Law 280 a bill of general applicability. The history fails, however, to indicate any congressional intent to exempt North Carolina from the universally preemptive effect of the Act. Although it was undeniably the purpose and intent of Congress to facilitate the States' assumption of criminal and civil jurisdiction by the passage of Public Law 280, it was also clearly the intent of Congress that each state do so by means of the appropriate procedure established therein; that is,

either by Section 6 or by Section 7. Although the Act, so construed, would have the unfortunate effect of temporarily cutting off North Carolina's theretofore unchallenged exercise of jurisdiction over the members of the Eastern Band, it also provided the means by which such jurisdiction could be validly acquired: "at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." 18 U.S.C. § 1162. Thus, it was evidently the intent of Congress, from 1953 until 1968, that the decision to exercise a state's jurisdiction over the conduct of Indians within Indian country was to be made by the people of each affected state through affirmative legislative action and not through case by case adjudication in the various state and federal courts. This conclusion is amply supported by the cases arising under Public Law 280 during the last twenty-five years.

C

The Supreme Court has consistently held that Public Law 280 and the Indian Civil Rights Act constitute the sole and exclusive means by which a state may obtain jurisdiction over civil suits involving only Indians within Indian country. *Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed. 2d 106 (1976); *Kennerly v. District Court of Montana*, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed. 2d 507 (1971); *Williams v. Lee, supra. See also United States v. John, supra* (criminal jurisdiction). The Court has also consistently construed the scope of Public Law 280's delegation of jurisdiction narrowly, in view of the post-1953 movement of federal Indian policy away from assimilation and towards preservation of the right of tribal self-government. *See, e.g. Bryan v. Itasca County, supra; see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed. 2d 106 (1978) (construing Title I of the Indian Civil Rights Act, 25 U.S.C. §§ 1301-1303, narrowly to protect tribal sovereignty from undue interference). *But see Washington v. Yakima Indian Nation, supra* (Section 6 of Public Law 280 did not require disclaimer states to amend their constitutions to make an effective acceptance of jurisdiction; positive legislative action under Public Law 280 is sufficient unless state law requires constitutional amendment).

In *Kennerly v. District Court of Montana, supra*, the state of Montana asserted jurisdiction under Public Law 280 on the basis

of a 1967 Blackfeet Tribal Council action providing that the "Tribal Court and the State shall have concurrent and not exclusive jurisdiction of all suits wherein the defendant is a member of the Tribe which is brought before the Courts." 400 U.S. at 425, 91 S.Ct. at 481, 27 L.Ed. 2d at 510. The Supreme Court first determined that Public Law 280 was a "governing Act of Congress" with regard to the particular question of the extension of state jurisdiction over civil causes of action by or against Indians arising in Indian country. Next, the Court addressed the means by which a state could validly assume such jurisdiction:

> Section 7 of that statute conditioned the assumption of state jurisdiction on "affirmative legislative action" by the State; the Act made no provision whatsoever for tribal consent, either as a necessary or sufficient condition to the assumption of state jurisdiction. Nor was the requirement of affirmative legislative action an idle choice of words; the legislative history of the 1953 statute shows that *the requirement was intended to assure that state jurisdiction would not be extended until the jurisdictions to be responsible for the portion of Indian country concerned manifested by political action their willingness and ability to discharge their new responsibilities.* (Citations omitted and emphasis added.)

*Id.* at 427, 91 S.Ct. at 482, 27 L.Ed. 2d at 511. Finally, the Court held that in the absence of affirmative legislative action with respect to the Blackfeet Reservation, the unilateral action of the Tribal Council was insufficient to vest Montana with jurisdiction over Indian country under the 1953 Act. *Id.*

Similarly, in *Fisher v. District Court, supra,* the Supreme Court concluded that the Montana state courts lacked jurisdiction over reservation Indian adoption proceedings and held that the Tribal Court of the Northern Cheyenne Tribe had exclusive jurisdiction over an adoption proceeding arising on the Northern Cheyenne Indian Reservation in which all parties are members of the tribe residing on the reservation. The state had not been granted, nor had it assumed, civil jurisdiction over the Northern Cheyenne Indian Reservation under either Public Law 280 or under Title IV of the Civil Rights Act of 1968, 25 U.S.C. § 1341 (1976 & 1983 Supp.). Accordingly, the Court held that no federal statute sanctioned state court jurisdiction over the subject matter

of the lawsuit. The court reasoned further that such jurisdiction would interfere with the powers of self-government conferred upon the tribe by certain federal statutes and agreements establishing the reservation and exercised through the Tribal Court, which was established pursuant to the tribe's 1935 constitution and bylaws.

The individual members of the tribe who initiated the subject adoption proceeding in the state court additionally argued that the ordinances of the tribe could not deprive the Montana courts of the jurisdiction they exercised over tribal matters prior to the organization of the tribe in 1935. The argument was rejected on the basis of federal preemption, standing alone. The Court held that even assuming that Montana courts had properly exercised jurisdiction prior to the organization of the tribe, such jurisdiction had been preempted as of 1934. The tribal ordinance conferring jurisdiction on the Tribal Court was authorized by § 16 of the Indian Reorganization Act, 25 U.S.C. § 476. "Consequently, it implements an overriding federal policy which is clearly adequate to defeat state jurisdiction over litigation involving reservation Indians." 424 U.S. at 390, 96 S.Ct. at 948, 47 L.Ed. 2d at 113.

Admittedly, the *Fisher* Court placed great emphasis on the fact the Tribal Council of the Northern Cheyenne Tribe had established a Tribal Court and granted it jurisdiction over adoptions among members of the tribe. However, I do not agree with the majority that the lack of a similar Tribal Court on the Eastern Cherokee Reservation removes this case from the ambit of *Fisher* and *Kennerly* with regard to the preemptive effect of Public Law 280 and the requirement that affirmative political action be taken by the state legislature to acquire jurisdiction. There is no indication in the *Kennerly* discussion of Public Law 280 that the existence or non-existence of a Tribal Court was to be determinative of a state's need to comply with Section 7 in order to obtain effective jurisdiction over civil causes of action brought by or against Indians. The relevant question under Public Law 280 is whether Congress preempted the entire field of state court jurisdiction as of 1953, not whether any particular Indian tribe did or did not have a Tribal Court functioning at that time for civil dispute resolution. My research has disclosed no case in which a state has been held exempt from the preemptive sweep of Public Law 280, nor any intimation in any of the reported cases

that such an exemption may be implied through judicial construction.[5]

The judicial reluctance to extend state jurisdiction over civil causes of action arising between Indians in Indian country undoubtedly stems from the recognition that Indian tribes have retained a semi-independent position as a separate people with the power of regulating their internal and social relations. *White Mountain, supra.* This "backdrop" of tribal sovereignty has clearly informed the federal preemption decisions on the question of state jurisdiction over reservation Indians.

> The Indian preemption decisions are highly protective of tribal self-government in Indian country and allow minimal application of state law. The limited role of the states under the Supremacy Clause results from retained tribal sovereignty, from a comprehensive federal legislative scheme dating to the beginning of the nation, and from extensive federal administrative activity by the Bureau of Indian Affairs and other agencies. [Par.] *The single most important factor in state exclusion is tribal sovereignty under the protection of federal law.*

F. Cohen, *supra,* at 270. Moreover, "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *White Mountain, supra,* at 144, 100 S.Ct. at 2584, 65 L.Ed. 2d at 673. One area of extensive tribal power is

---

5. In only one recently decided case involving a contract action brought by an Indian tribe against a non-Indian for a claim arising on the tribe's reservation has the Supreme Court indicated that jurisdiction "lawfully assumed" by a state prior to 1953 was not divested by Public Law 280, nor was a disclaimer of such jurisdiction authorized by the statute; *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* P.C., --- U.S. ---, 104 S.Ct. 2267, 81 L.Ed. 2d 113 (1984). Although the opinion contains many broad statements about the purpose and effect of Public Law 280 that appear, at first glance, to support the appellee's claim that North Carolina's jurisdiction was not preempted by the Act of 1953, a close reading of the text dispels this impression. The "lawfully assumed jurisdiction" referred to is *only* the state's jurisdiction to entertain a civil action by an Indian tribe against a non-Indian for a claim arising on an Indian reservation. It is not the state's *coercive* jurisdiction over claims by non-Indians against Indians or more importantly, over claims between Indians, and the Court was very careful to distinguish those situations from the situation in the *Wold* case itself. The Court acknowledged that the

domestic relations among tribal members. F. Cohen, *supra*, at 249. *See, e.g., Fisher v. District Court, supra* (adoption proceedings); *United States v. Quiver,* 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916) (adultery; relations of Indians among themselves is to be controlled by the customs and laws of the tribe, save when Congress expressly or clearly directs otherwise).

Indeed, it is a feature of the tribal-federal relationship that exclusive tribal judicial jurisdiction over internal reservation affairs is generally retained unless this power is removed by explicit legislation. F. Cohen, *supra*, at 250. The absence of a specific tribal mechanism for the enforcement of tribal rules or of court judgments does not affect a tribe's exclusive judicial jurisdiction. *See id.* at 250, n. 62, and cases cited therein. This is so because the right protected is the "right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee, supra,* at 220, 79 S.Ct. at 271, 3 L.Ed. 2d at 254. Thus, the federally protected, retained tribal power to administer justice is not dependent on the establishment of a tribal court modelled on either the state or federal court system.

There is no indication in either *Fisher* and *Kennerly* that the Supreme Court limited its interpretation of the scope of Public Law 280 to only those states containing Indian reservations lacking tribal courts. *See also Washington v. Yakima Indian Nation, supra.* Furthermore, the Court has repeatedly recognized "[n]onjudicial tribal institutions . . . as competent law applying bodies." *Santa Clara Pueblo v. Martinez, supra,* at 66, 98 S.Ct. at 1681, 56

interests implicated where the tribe itself brings suit are "very different" from those implicated where a non-Indian sued an Indian as an action in which all parties were tribal Indians, *comparing McClanahan v. Arizona State Tax Comm'n, supra,* with *Williams v. Lee, supra* and *Fisher v. District Court, supra.* As the Court in *McClanahan noted,* the jurisdictional situation involving non-Indians is governed by different principles than the situation involving only tribal Indians because in the former, "both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions." 411 U.S. at 179, 93 S.Ct. at 1266, 36 L.Ed. 2d at 140. In sharp contrast, the exercise of state court jurisdiction over claims between Indians for on-reservation conduct is acknowledged to "intrud[e] impermissibly on tribal self-governance." --- U.S. at ---, 104 S.Ct. at 2274, 81 L.Ed. 2d at 122. Accordingly, and for the reasons stated in Part I of this opinion, North Carolina's historical exercise of jurisdiction over civil actions between tribal Indians for on-reservation conduct cannot be considered "lawfully assumed jurisdiction" capable of surviving the enactment of Public Law 280.

---

---

L.Ed. 2d at 120; *see also United States v. Mazurie, supra* (tribal councils constitute appropriate bodies in which Congress may vest a portion of its own authority under the Indian Commerce Clause).

As I understand the controlling cases involving conflicting claims of tribal-state jurisdiction, the Supreme Court has conclusively and without exception held that Public Law 280 bars *any* state civil jurisdiction over Indians for on-reservation conduct that is not assumed in conformity with this "governing Act of Congress" regarding state acquisitions of jurisdiction after 1953. This view is also held by a number of state courts which have denied state jurisdiction over reservation Indians on the ground that the state had not accepted Congress' invitation to take jurisdiction under Public Law 280. *See, e.g., Morgan v. Colorado River Indian Tribe,* 7 Ariz. App. 92, 436 P. 2d 484, *vacated on other grounds,* 103 Ariz. 425, 443 P. 2d 421 (1968) (civil jurisdiction over Indian tribe for alleged tort committed on reservation); *Francisco v. State,* 113 Ariz. 427, 556 P. 2d 1 (1976) (personal jurisdiction; paternity actions); *Martin v. Denver Juvenile Court,* 177 Colo. 261, 493 P. 2d 1093 (1972) (paternity actions); *Annis v. Dewey County Bank,* 335 F. Supp. 133 (D.S.D. 1971) (civil jurisdiction to enforce judgment on reservation); *Blackwolf v. District Court,* 158 Mont. 523, 493 P. 2d 1293 (1972) (juvenile delinquency proceedings); *Crow Tribe v. Deernose,* 158 Mont. 25, 487 P. 2d 1133 (1971) (jurisdiction over real estate mortgage foreclosure action on Indian trust lands). *See generally,* F. Cohen, *supra,* at 362-368.

### III

In conclusion, I cannot agree with the majority's holding that North Carolina's civil jurisdiction over the Eastern Band was not divested by the passage of Public Law 280. As the foregoing discussion demonstrates, the general rule is that federal protection of tribal self-government precludes either criminal or civil jurisdiction of state courts over Indians or their property absent the consent of Congress. Although the members of the Eastern Band of Cherokees are citizens of North Carolina, they are, nevertheless, a federally recognized Indian tribe, living on an Indian reservation held in trust by the United States for their benefit. The preeminent federal supervisory authority over the Eastern

Band was neither terminated nor diminished by the Treaty of New Echota. Jurisdictional controversies between the states and Indian tribes having a "dual status" deriving from early treaties of removal, such as the Eastern Band, are to be resolved by looking at the current status of the Indians under federal law; such treaty rights or provisions did not immutably fix the relation between the state of North Carolina and the Eastern Band. Under federal Indian law, the legal status of the members of the Eastern Band did not differ materially from that of other Indian tribes at the time Public Law 280 was enacted.

In my opinion, the language, legislative history and controlling decisions of the United States Supreme Court interpreting Public Law 280 establish that the statute is *the* governing act of Congress regarding state judicial jurisdiction over civil causes of action brought by or against Indians arising in Indian country. It is a preemptive act of general applicability; by its express terms, Public Law 280 had the effect of abrogating all prior inconsistent treaty provisions governing jurisdictional matters. To date, no state has been judicially found to be exempt from the preemptive sweep of Public Law 280. The legislative history of the Act with regard to North Carolina is at best inconclusive and fails to indicate any congressional intent to exempt North Carolina from compliance with the procedures established therein to acquire effective jurisdiction over the Eastern Band of Cherokees.

Therefore, prior to 1968, North Carolina could only have obtained such jurisdiction by affirmative legislative action. Strict compliance with Public Law 280's requirement that the people of each state make this choice *politically*, either through amendatory action, where required, or by affirmative legislative action, has been mandated by the Supreme Court in its interpretations of this federal statute. Consequently, Public Law 280 has consistently been construed to bar any state jurisdiction that is not assumed in conformity with its provisions.

From a practical standpoint, the majority's conclusion that Public Law 280 was not meant to cut off state jurisdiction over civil suits between reservation Indians who had no tribal court system is unarguably reasonable. However, the Act itself contains no express exemption for North Carolina on this basis and, again, the legislative history with regard to the jurisdictional situation

---

in North Carolina is too speculative a basis upon which to judicially recognize an implied exemption. The federally protected power of the Indian tribes to administer justice over the domestic relations among tribal members living on the reservation is simply not dependent on the establishment of a tribal court system. Accordingly, I find no basis upon which North Carolina's jurisdictional claims over reservation Indians may be distinguished in principle from those of any other state. The laudatory concern underlying the majority's opinion, that some thirty years of state court judgments involving Indians not be rendered nugatory, may be best addressed by the state legislature, with the consent of Congress, in the form of a curative statute. I, however, am unable to reach this result by judicial construction. Therefore, I must respectfully concur only in the result reached today on the ground that the trial court lacked jurisdiction over the subject matter of this lawsuit.