JAMES GRAHAM SASSER, BY HIS GUARDIAN AD LITEM, H. BRUCE HULSE v. SAM BECK AND WIFE, MRS. SAM BECK, T/A THE PRINCESS MOTEL

No. 788SC589

(Filed 17 April 1979)

**Indians § 1 — tort on Cherokee lands — action against Cherokee Indian — jurisdiction of courts of this State**

The courts of this State have jurisdiction over a member of the Eastern Band of Cherokee Indians in a tort claim by a non-Indian arising from an oc-

currence on land within the Qualla Boundary, since the State of North Carolina acquired civil jurisdiction over the Eastern Band of Cherokee Indians when the Cherokee Nation emigrated to lands west of the Mississippi River following the Treaty of New Echota in 1835, and such jurisdiction was not removed by the fact that the Eastern Band of Cherokee Indians has since been recognized as an Indian tribe and brought under federal supervision.

APPEAL by defendant from *Davis, Judge.* Order filed 10 April 1978 in Superior Court, WAYNE County. Heard in the Court of Appeals 26 March 1979.

The minor plaintiff by his guardian brings this action to recover for personal injuries he sustained in a swimming pool at defendants' motel. Defendant Sam Beck moved to dismiss for lack of subject matter and personal jurisdiction, on the grounds that he is a member of the Eastern Band of Cherokee Indians, that his motel is located on Cherokee lands, and that the Eastern Band of Cherokee Indians has never agreed to accept North Carolina State jurisdiction.

Defendant's motion was denied, and his petition for a writ of certiorari was allowed by this Court.

*Duke & Brown, by John E. Duke, and Hulse & Hulse, by Herbert B. Hulse, for plaintiff appellee.*

*Smith, Anderson, Blount & Mitchell, by Samuel G. Thompson, and Van Winkle, Buck, Wall, Starnes, Hyde & Davis, by Herbert L. Hyde, for defendant appellant.*

ARNOLD, Judge.

The question of first impression presented by this appeal is whether the courts of this State have jurisdiction over a member of the Eastern Band of Cherokee Indians in a tort claim by a non-Indian arising from an occurrence on land within the Qualla Boundary.

The history of the Cherokee Indians is set out at length in *Eastern Band of Cherokee Indians v. United States,* 117 U.S. 288, 6 S.Ct. 718, 29 L.Ed. 880 (1886), and *United States v. Wright,* 53 F. 2d 300, *cert. den.* 285 U.S. 539 (4th Cir. 1931). The Cherokee originally occupied the territory that is now North and South Carolina, Georgia, Alabama and Tennessee. When this country

was settled by Europeans, England claimed sovereignty over this territory, subject to the possessory right of the Indians over the lands they occupied. By treaties enacted in the period between 1785 and 1835, the possessory right of the Cherokee over North Carolina lands was gradually extinguished. By treaty of 1785, the United States was given the exclusive right to manage all Indian affairs, and the Cherokee Nation was brought under federal jurisdiction. In 1817, the Cherokee by treaty ceded to the federal government certain lands east of the Mississippi and received in exchange land on the Arkansas and White Rivers. Approximately one-third of the Cherokees emigrated to these western lands.

Under the Treaty of New Echota, made in 1835, the remaining Cherokees ceded to the United States all their land east of the Mississippi and agreed to move to the western lands. Many of the eastern Cherokee were reluctant to emigrate, however, and eventually eleven or twelve hundred remained behind. The Supreme Court said in *Eastern Band of Cherokee Indians v. United States, supra,* that those who remained "ceased to be part of the Cherokee Nation, and henceforth they became citizens of and were subject to the laws of the state in which they resided." *Id.* at 303, 6 S.Ct. at 724, 29 L.Ed. at 884.

The United States first recognized the rights of the Indians who had remained in North Carolina by an Act of 1848, establishing a fund for their benefit. The Qualla Boundary lands were purchased partly with money from this fund. In 1866 the North Carolina legislature passed a statute granting the Cherokee permission to remain in the State, and in 1868 Congress provided that the Secretary of the Interior should "take the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians." *U.S. v. Wright, supra* at 303. In 1889 the Eastern Cherokees were incorporated under the laws of North Carolina, and in 1897 their charter was amended to give the Cherokee limited power of government, with special reference to control of tribal property. The title to the Qualla Boundary lands, which had been held by the Commissioner of Indian Affairs, was conveyed to the corporation but remained subject to the supervision of the Commissioner. This title was conveyed to the United States in trust in 1925.

It is against this historical background that we consider the limited case law dealing with civil jurisdiction over the Eastern

Band of Cherokee. Prior to the 1885 Supreme Court decision in *Eastern Band of Cherokee Indians v. United States, supra,* dicta in two North Carolina cases had indicated that the cherokee were subject to our civil jurisdiction. In *State v. Ta-Cha-Na-Tah,* 64 N.C. 614, 615 (1870), a criminal prosecution, the court noted that "[o]n examination of the Treaty of New Echotah, . . . we find, that, Article XII, it was provided, that individuals and families who were averse to moving West of the Mississippi River, might remain, and become citizens of the States where they resided. Our civil laws have been extended over these Indians, at least, ever since 1838: Rev. Code, ch. 50, sec. 16." (This Code section dealt with fraudulent conveyances, creating a statute of frauds requirement for any contract made with an Indian.) In *Rollins v. The Eastern Band of Cherokee Indians,* 87 N.C. 229 (1882), the court held that a federal statute controlled the effect of contracts made with Indians, but noted that the Act of Congress of 1868 which gave the Commissioner of Indian Affairs "the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians" gave him authority to establish schools, appoint agents, and organize local government and public administration, "but of course in subordination to the state government." *Id.* at 242. This view was reaffirmed by the court in 1907 in *State v. Wolf,* 145 N.C. 441, 444, 59 S.E. 40, 42: "Indians are subject to the general laws of the State, unless specially excepted."

Subsequent to these early North Carolina decisions, *United States v. Wright, supra,* was decided by the Fourth Circuit Court of Appeals. That court, holding that Congress could exempt Indian lands from taxation, noted in often-quoted dicta Congress' limited authority, and the existence of state jurisdiction over the Eastern Band of Cherokee:

> [W]e think there can be no doubt that Congress has the power to legislate for the protection of the Eastern Band of Cherokee Indians and for the regulation of the affairs of the band. It is clear, however, that not every act of Congress with relation to the band would come within the power. . . . [T]he members of the band, by separation from the original tribe, have become subject to the laws of the state of North Carolina; and clearly no act of Congress in their behalf would be valid which interfered with the exercise of the police power of the state. . . . [A] law to be sustained must have

relation to the purpose for which the federal government exercises guardianship and protection over a people subject to the laws of one of the states; *i.e.*, it must have reasonable relation to their economic welfare.

*Id.* at 307. This language was relied upon by our Supreme Court in finding state jurisdiction in a criminal case. *State v. McAlhaney*, 220 N.C. 387, 17 S.E. 2d 352 (1941).

In 1953, Congress enacted Public Law 280, 28 U.S.C. 1360, giving to five states, not including North Carolina, "jurisdiction over civil causes of action . . . to which Indians are parties which arise in . . . Indian country . . . to the same extent that such State . . . has jurisdiction over other civil causes of action . . . ." Sec. 7 of this law, now repealed, gave the consent of the United States "to any other State not having jurisdiction with respect to . . . civil causes of action . . . to assume jurisdiction . . . ." North Carolina did not assume jurisdiction under this law, but in 1957 the Fourth Circuit found state tort jurisdiction in a case closely analogous to the one before us. The non-Indian plaintiff in *Haile v. Saunooke*, 246 F. 2d 293, *cert. den.* 355 U.S. 893 (4th Cir. 1957) sought to recover for personal injuries suffered in the collapse of a swinging bridge located on Indian land. The court, without referring to Public Law 280, upheld the dismissal of the action against the Eastern Band of Cherokee and the United States as trustee and guardian of the tribe and the individual defendants, but allowed the suit against the individual Indian defendants to proceed.

The most recent federal legislation concerning State civil jurisdiction over Indians was enacted in 1968. By the terms of 25 U.S.C. 1322(a), the United States gave consent "to any State *not having jurisdiction* over civil causes of action . . . to which Indians are parties which arise in . . . Indian country [emphasis added]" to assume such jurisdiction with the consent of the tribe affected. Since it is uncontradicted that the Eastern Band of Cherokee has never given its consent to state jurisdiction, North Carolina has assumed no jurisdiction under this section.

The question, then, clearly is not whether North Carolina has assumed civil jurisdiction over the Eastern Band of Cherokee by complying with a federal statute, but whether by virtue of jurisdiction existing at the time the statutes were enacted North

Carolina is exempt from such compliance. Both applicable statutes contain language which implies that such exemption is possible, since each gives federal consent to jurisdiction in "any State not having jurisdiction." The later statute, 25 U.S.C. 1322(a), might be interpreted to mean "any State not having jurisdiction *by virtue of the earlier statute*," but such an interpretation would be nonsensical if applied to Sec. 7 of Public Law 280, since it was the first statute enacted on the subject. Accordingly, it must have been possible, prior to enactment of the statutes, for state courts to obtain civil jurisdiction over Indians in other ways.

The limited case law on the subject, from both the North Carolina and federal circuit courts, supports our conclusion that North Carolina has had civil jurisdiction over the Eastern Band of Cherokee at least since the emigration west following the Treaty of New Echota, when the Indians remaining in North Carolina became "subject to the laws of the state." The fact that these Indians have since been recognized as an Indian tribe and brought under federal supervision did not remove the existing jurisdiction of the State of North Carolina.

Our view that state jurisdiction over Indian affairs continued is in accord with the analysis of this question found in the leading treatise on the subject, Felix S. Cohen's Handbook of Federal Indian Law (1942):

> While the general rule . . . is that plenary authority over Indian affairs rests in the Federal Government to the exclusion of state governments, we have . . . noted two major exceptions to this general rule: First, where Congress has expressly declared that certain powers over Indian affairs shall be exercised by the states, and second, where the matter involves ·non-Indian questions sufficient to ground state jurisdiction.

*Id.* at 119. Having examined the effect of the factors of situs, person and subject matter on exclusive federal jurisdiction, Cohen concludes:

> The foregoing sections may be summarized in two propositions:

(1) In matters involving only Indians on an Indian reservation, the state has no jurisdiction in the absence of specific legislation by Congress.

(2) In all other cases, the state has jurisdiction unless there is involved a subject matter of special federal concern.

*Id.* at 121. We also find persuasive the reasoning of the federal court in *United States v. Wright, supra,* that the purpose of the federal guardianship was to protect the Indians' *economic* welfare, and not to interfere with the police power of the state over its citizens.

Nor do we find that the enactment of Public Law 280 terminated existing jurisdiction. The exemption language in the statute itself belies this, as does the legislative history of the statute, set out by the United States Supreme Court in the recent case of *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* --- U.S. --- (No. 77-388, 47 L.W. 4111, 16 Jan. 1979):

Pub. L. 280 was the first jurisdictional bill of general applicability ever to be enacted by Congress. It reflected congressional concern over . . . the financial burdens of continued federal jurisdictional responsibilities on Indian lands. . . . It was also, however, without question reflective of the general assimilationist policy followed by Congress from the early 1950's through the late 1960's. [This policy, set out in n. 32 of the opinion, was 'as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws . . . as are applicable to other citizens of the United States, [and] to end their status as wards of the United States. . . .']

Indeed, the circumstances surrounding the passage of Pub. L. 280 in themselves fully bear out the State's general thesis that Pub. L. 280 was intended to facilitate, not to impede, the transfer of jurisdictional responsibility to the States.

*Id.,* 47 L.W. at 4118.

We find that North Carolina's civil jurisdiction over the Eastern Band of Cherokee continues to this day, and that our

courts have jurisdiction over this tort action. Defendants' motions to dismiss for lack of personal and subject matter jurisdiction were properly denied. The order of the trial court is

Affirmed.

Chief Judge MORRIS and Judge CLARK concur.