NO. COA13-873

NORTH CAROLINA COURT OF APPEALS

Filed: 18 March 2014

STATE OF NORTH CAROLINA

v.                                    Swain County
                                      No. 10 CRS 277
STEVEN CLARK KOSTICK,
     Defendant.


Appeal by defendant from judgment entered 22 February 2013 by Judge James U. Downs in Swain County Superior Court. Heard in the Court of Appeals 11 December 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Neil Dalton and Assistant Attorney General Kathryne E. Hathcock, for the State.*
>
> *McLean Law Firm, P.A., by Russell L. McLean, III, for defendant-appellant.*


BRYANT, Judge.


Pursuant to the Tribal Code of the Eastern Band of the Cherokee Indians and mutual compact agreements between the Tribe and other law enforcement agencies, the North Carolina Highway Patrol has authority to patrol and enforce the motor vehicle laws of North Carolina within the Qualla boundary of the Tribe, including authority to arrest non-Indians who commit criminal

offenses on the Cherokee reservation. Our State courts have jurisdiction over the criminal offense of driving while impaired committed by a non-Indian, even where the offense and subsequent arrest occur within the Qualla boundary of the Cherokee reservation. A defendant's *Knoll* motion is properly dismissed where the magistrate follows N.C. Gen. Stat. § 15A-511(b) and any deviation from the statutory requirements is not prejudicial to defendant.

On 24 April 2010, the Cherokee Harley Davidson Rally (the "rally") was held at the fairgrounds in Cherokee, North Carolina. As part of a cooperative agreement between the Eastern Band of the Cherokee Indians (the "Tribe") and Swain County police departments and the North Carolina State Highway Patrol ("State Highway Patrol"), Swain County and State Highway Patrol officers assisted the Cherokee police officers in patrolling the rally, setting up and administering checkpoints, and providing assistance as needed. Checkpoints were established at the roads leading into and out of the fairgrounds, Drama Road/State Highway 1361 and State Highway 441, and were run by a combination of Cherokee and Swain County police officers. The checkpoints were intended to check all vehicles leaving the

rally for potential driving while impaired ("DWI"), driver's license, insurance, and unsafe driving violations.

That evening at around 10:00 p.m., defendant Steven Clark Kostick ("defendant") left the rally's parking lot and encountered a checkpoint on Drama Road. After rolling two car lengths past Cherokee Officer Dustin Wright who signaled for defendant to stop, defendant stopped his vehicle. As Officer Wright approached the vehicle, he immediately noticed an odor of alcohol and saw two open cans of beer in the car's center console cup holders. Officer Wright also noticed that a woman sitting in the front passenger seat of the vehicle was crying. Officer Wright directed defendant to return his vehicle to the parking lot and called for an available officer to come and conduct an investigation of defendant.

The responding officer was State Highway Patrol Trooper Jim Hipp who took over the investigation of defendant at the request of Officer Wright. After noticing that defendant smelled of alcohol, had red, glassy eyes, slurred speech, and an unsteady gait, Trooper Hipp conducted four field sobriety tests and concluded that defendant was likely intoxicated. Defendant told Trooper Hipp that he had consumed four to five beers that evening, and then admitted to having a handgun in his truck.

The woman in defendant's car was driven by another officer back to the vacation cabin where she was staying with defendant.

Trooper Hipp arrested defendant on suspicion of DWI. Defendant was taken to the Swain County jail where he blew a 0.15 on a Breathalyzer test. Defendant was arraigned by a magistrate after being charged with DWI and was ordered to be held on a $500.00 secured bond. Defendant was released from the Swain County jail around 4 a.m. on 25 April 2010 after posting bail.

On 24 November 2011, defendant filed handwritten motions to suppress (entitled "Motion to Suppress Stop and Arrest;" "Motion to Suppress"). On 2 December 2011, defendant filed a motion to dismiss alleging lack of jurisdiction over defendant's arrest. The trial court denied all of defendant's motions, and on 6 April 2011, defendant was convicted of DWI in District Court. Defendant appealed his conviction to the Superior Court.

On 8 December 2011, defendant filed a new motion to dismiss alleging that the State Highway Patrol had no arrest authority within the Cherokee reservation and that defendant was on Cherokee, rather than State, property at the time of his arrest. Defendant further moved to suppress the evidence regarding the checkpoint stop and made a *Knoll* motion alleging that the

magistrate did not properly inform defendant of his right to contact counsel and friends upon his arrest. At a pretrial hearing on 20—21 February 2013, defendant's motions were denied. On 22 February 2013, a jury convicted defendant of DWI. Defendant appeals.

_____

On appeal, defendant challenges (I) the subject matter jurisdiction of the trial court, including whether the road on which defendant was stopped was a North Carolina state road, whether the North Carolina Highway Patrol had arrest authority, and whether the trial court erred in denying defendant's pretrial motion to dismiss the DWI charges; (II) whether the roadblock set-up by the Cherokee Police Department was constitutional; and (III) the trial court's failure to grant defendant's *Knoll* motion to dismiss the DWI citation.

*Motion to Dismiss*

On 2 October 2013, the State filed a motion to dismiss defendant's appeal, arguing that defendant failed to properly preserve his appeal. Specifically, the State contends that the record on appeal is insufficient because defendant failed to include a complete trial transcript to show that defendant properly renewed his pretrial objections at trial as to subject

matter jurisdiction, suppression of evidence from the checkpoint and a *Knoll* violation, and that without proof that defendant did renew his objections at trial, those objections cannot be deemed to be preserved on appeal. Defendant, on the other hand, counters that he "has preserved each and every issue on appeal."

Pursuant to our Rules of Appellate Procedure, "[t]he record on appeal in criminal actions shall contain . . . so much of the litigation, set out in the form provided in Rule 9(c)(l), as is necessary for an understanding of all issues presented on appeal . . . ." N.C. R. App. P. 9(a)(3)(e) (2013).

> In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion. Any such issue that was properly preserved for review by action of counsel taken during the course of proceedings in the trial tribunal by objection noted or which by rule or law was deemed preserved or taken without any such action, including, but not limited to, whether the judgment is supported by the verdict or by the findings of fact and conclusions of law, whether the court had jurisdiction over the subject matter, and whether a criminal charge is sufficient in law, may be made the basis of an issue presented on appeal.

N.C. R. App. P. 10(a)(1) (2013). Where a defendant does not preserve an issue for appeal, that issue may only then be appealed by claiming plain error pursuant to N.C. R. App. P. 10(a)(4). *State v. Waring*, 364 N.C. 443, 467—68, 701 S.E.2d 615, 631—32 (2010).

The State contends that defendant's appeal should be dismissed in its entirety because by not providing a complete trial transcript the record on appeal is insufficient. At the pretrial hearing, defendant raised three motions: a motion to dismiss for lack of subject matter jurisdiction; a motion to suppress evidence from the checkpoint; and a *Knoll* motion.

*A. Defendant's motion to dismiss for lack of subject matter jurisdiction*

Defendant provided a trial transcript for the pretrial hearing of 20—21 February 2013 but did not provide the transcript for his jury trial on 22 February 2013. However, a determination of subject matter jurisdiction does not require the presence of a complete trial transcript, as "[j]urisdiction has been defined as 'the power to hear and to determine a legal controversy; to inquire into the facts, apply the law, and to render and enforce a judgment[.]'" *High v. Pearce*, 220 N.C. 266, 271, 17 S.E.2d 108, 112 (1941) (citation omitted). As

such, defendant's failure to include a trial transcript for his jury trial on 22 February 2013 does not negate his appeal regarding his motion to dismiss for lack of subject matter jurisdiction. *See* N.C. R. App. P. 10(a)(1). The State's motion to dismiss defendant's appeal as it relates to the issue of subject matter jurisdiction must, therefore, be denied.

*B. Defendant's motion to suppress evidence from the checkpoint*

> [A] motion in limine is insufficient to preserve for appeal the question of the admissibility of evidence if the defendant fails to further object to that evidence at the time it is offered at trial. Rulings on motions in limine are preliminary in nature and subject to change at trial, depending on the evidence offered, and thus an objection to an order granting or denying the motion is insufficient to preserve for appeal the question of the admissibility of the evidence.

*State v. Reaves*, 196 N.C. App. 683, 686, 676 S.E.2d 74, 77 (2009) (citation omitted).

Defendant made a pretrial motion to suppress evidence regarding the checkpoint and DWI arrest. However, defendant omitted the transcript of his jury trial; therefore, we have no objective means of ascertaining whether defendant renewed his motion to suppress at trial. "[A] pretrial motion to suppress, a type of motion *in limine,* is not sufficient to preserve for appeal the issue of admissibility of evidence . . . .

[Therefore, a] defendant waive[s] appellate review of this issue by failing to object during trial to the admission" of the challenged evidence. *State v. Grooms*, 353 N.C. 50, 66, 540 S.E.2d 713, 723 (2000) (citation omitted). Defendant, however, points to the record of the pretrial hearing; there the trial court denied his motion to suppress and noted defendant's "exception" to the trial court's ruling. Further, defendant points to an agreement between the State and defendant that the pretrial hearing transcript would be sufficient for purposes of defendant's appeal. This agreement is part of the record on appeal.[1] Therefore, even if defendant's issue is not properly preserved, to prevent manifest injustice to defendant we

---

[1] The Settlement of Transcript, which is signed by counsel for both the State and defendant and dated 14 March 2013, states that:

> NOW COMES the undersigned attorneys on behalf of the Plaintiff, State of North Carolina and the Defendant, Steven Kostick as evidenced by their signatures hereto, and agree that the court reporter who transcribed the proceedings is only required to transcribe all motions to suppress for lack of subject matter jurisdiction and that the trial transcript need not be transcribed since the Defendant is only appealing the court's subject matter jurisdiction over the Defendant to the North Carolina Court of Appeals.

exercise our authority pursuant to Rule 2 and hear defendant's appeal of this issue.

*C. Defendant's Knoll motion*

A *Knoll* motion, based on *State v. Knoll,* 322 N.C. 535, 369 S.E.2d 558 (1988), alleges that a magistrate has failed to inform a defendant of the charges against him, his right to communicate with counsel, family, and friends, and the general conditions he must meet for pretrial release pursuant to N.C. Gen. Stat. § 15A-511 (2013). "If there is a conflict between the state's evidence and defendant's evidence on material facts, it is the duty of the trial court to resolve the conflict and such resolution will not be disturbed on appeal." *State v. Lewis*, 147 N.C. App. 274, 277, 555 S.E.2d 348, 351 (2001) (citation omitted).

Here, the trial court heard arguments by both sides and made its findings of fact and conclusions of law during the pretrial hearing; therefore, a transcript of defendant's jury trial is not necessary for our review of his *Knoll* motion. *See id.; Knoll,* 322 N.C. 535, 369 S.E.2d 558. Accordingly, the State's motion to dismiss defendant's *Knoll* motion is denied.

_____

*I.*

*Subject Matter Jurisdiction*

*A. North Carolina road*

Defendant first argues that the trial court erred in finding that the road on which defendant was stopped was a North Carolina state road. Specifically, defendant contends that the road on which he was stopped, Drama Road, is on federal land because it is controlled by the Tribe, and thus, the State had no authority to stop and arrest defendant while he was driving on it. Defendant's argument as to whether the road is controlled by the State or the Tribe lacks merit, as our State Highway Patrol enjoys an existing compact with the Tribe to assist with patrolling and enforcing roads within this state.

"[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004) (citations omitted). Congress has defined Indian country as

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the

> Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (2012). Indian tribes retain "attributes of sovereignty over both their members and their territory." *United States v. Mazurie*, 419 U.S. 544, 557 (1975). "[T]ribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 154 (1980). "[S]tate laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *Cal. v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987).

> Federal recognition of the [Cherokee] Eastern Band as an Indian tribe has at least two major implications for the issue of state jurisdiction: (1) the federal government continues to maintain plenary power over the Eastern Band, a fact which strictly limits extensions of state power, and (2) the Eastern Band, like all recognized Indian tribes, possesses the status of a "domestic dependent nation" with certain retained inherent sovereign powers.

*Wildcatt v. Smith*, 69 N.C. App. 1, 5—6, 316 S.E.2d 870, 874 (1984) (citations omitted). An Indian tribe may engage in a tribe-state compact "to facilitate the exercise of each government's respective authority." FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW § 6.05, at 591 (Nell Jessup Newton ed., 2012).

The reservation lands of the Tribe in our State are known as the Qualla boundary. *See Sasser v. Beck*, 40 N.C. App. 668, 670, 253 S.E.2d 577, 579 (1979) ("The United States first recognized the rights of the Indians who had remained in North Carolina by an Act of 1848, establishing a fund for their benefit. The Qualla Boundary lands were purchased partly with money from this fund. In 1866 the North Carolina legislature passed a statute granting the Cherokee permission to remain in the State, and in 1868 Congress provided that the Secretary of the Interior should 'take the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians.' In 1889 the eastern Cherokees were incorporated under the laws of North Carolina, and in 1897 their charter was amended to give the Cherokee limited power of government, with special reference to control of tribal property. The title to the Qualla Boundary lands, which had been held by the Commissioner of Indian Affairs, was conveyed to the corporation but remained subject to the supervision of the Commissioner. This title was conveyed to the United States in trust in 1925." (citation omitted)).

The Tribe's Code of Ordinances, section 20-1 states that:

> (a) *In order to ensure consistency in the application and enforcement of all civil and criminal traffic and motor vehicle laws on the Cherokee Indian Reservation and in*

*surrounding areas, the Tribe adopts Chapter
20 of the North Carolina General Statutes
and any amendments to that chapter which may
be made in the future.* In so doing, *all
persons operating motor vehicles on the
Cherokee Indian Reservation must abide by
these provisions . . . . Any references in
Chapter 20 of the N.C.G.S. to violations
occurring within the State of North Carolina
shall also include violations occurring
within the Cherokee Indian Reservation.*

. . .

(b) All civil traffic infractions contained
therein shall be enforced by the North
Carolina Highway Patrol, Federal Law
Enforcement Officers, and the Cherokee
Police Department . . . .

. . .

(e) *All traffic and motor vehicle violations
shall be enforced in accordance with
existing compacts in an effort to ensure
cooperation between all law enforcement
agencies.*

CHEROKEE INDIANS EASTERN BAND, N.C., CODE ch. 20, art. 1, § 20-1 (2013)

(emphasis added).  Moreover, pursuant to section 15-2 of the

Tribe's Code,

(a) The North Carolina Highway Patrol is
hereby authorized to patrol the roads and
highways on the Cherokee Indian Reservation
and to enforce the North Carolina traffic
laws as adopted by the Eastern Band of
Cherokee Indians.

(b) The North Carolina Highway Patrol is
hereby authorized to enforce the North
Carolina criminal laws against all persons

> who are not subject to the criminal laws of
> the Tribe or the criminal jurisdiction of
> the Cherokee Court.

*Id.* § 15-2.

Defendant contends that the road on which he was stopped, Drama Road, was not a road upon which the State Highway Patrol had jurisdiction to operate.

At his pretrial hearing, evidence was presented showing that Drama Road is held and maintained by the State within the Tribe's reservation, the Qualla boundary. However, pursuant to the Tribe's Code, section 20-1, the language of which is identical to that of Chapter 20 of our General Statutes, the State Highway Patrol has authority to "patrol the roads and highways on the . . . reservation." *Id.* Moreover, section 20-1(e) of the Tribal Code notes that "[a]ll traffic and motor vehicle violations shall be enforced in accordance with existing compacts in an effort to ensure cooperation between all law enforcement agencies." *Id.* Furthermore, testimony by Cherokee Officer Teesateskie and State Highway Patrol Trooper Hipp indicated that the Cherokee Police Department had a compact with the Swain County Police Department and the State Highway Patrol to provide assistance during the rally, and that this agreement had existed for several years.

Defendant was initially stopped by Cherokee Officer Wright on suspicion of Driving While Impaired before Trooper Hipp was called in to assist. As Trooper Hipp was authorized both under Tribal Code § 20-1 and the mutual assistance compact between the Tribe, the Swain County Police Department and the State Highway Patrol, the State Highway Patrol, through Trooper Hipp, had the right to assist the Tribe in stopping, investigating, and arresting defendant on Drama Road. Defendant's argument as to whether the State or the Tribe controls Drama Road is overruled, as is defendant's argument concerning Trooper Hipp's arrest authority.

*B. DWI Offense*

Defendant also contends the trial court lacked subject matter jurisdiction to prosecute defendant, a non-Indian, for a DWI offense incurred while defendant was on Indian land. We disagree.

A claim that the trial court lacks subject matter jurisdiction presents a question of law which is reviewed de novo. *State v. Satanek,* 190 N.C. App. 653, 656, 600 S.E.2d 623, 625 (2008). "[T]he issue of a court's jurisdiction over a matter may be raised at any time, even for the first time on

appeal or by a court *sua sponte*." *State v. Webber*, 190 N.C. App. 649, 650, 660 S.E.2d 621, 622 (2008) (citation omitted).

As discussed in *Issue I*, the Tribe has incorporated Chapter 20 of our General Statutes with regard to the regulation of motor vehicles into its Code. This incorporation and compact with neighboring police departments gave Trooper Hipp arrest authority over defendant. In determining whether the State then had subject matter jurisdiction over defendant's DWI offense, we must look to general principles of Indian sovereignity.

> [T]he Indian Civil Rights Act . . . permit[s] states to assume jurisdiction over civil cases involving Indians and arising in Indian country by consent of the tribe affected. The Eastern Band has never given formal consent to the assumption of state jurisdiction pursuant to the Indian Civil Rights Act.

*Wildcatt*, 69 N.C. App. at 7, 316 S.E.2d at 875 (citing *Sasser v. Beck*, 40 N.C. App. 668, 253 S.E.2d 577 (1979)). Pursuant to 18 U.S.C. § 1153, an Indian tribe has jurisdiction over crimes committed by both its own Indian members and by Indian members of other tribes. 18 U.S.C. § 1153 (2012); *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978) (holding that by submitting to the overriding sovereignty of the United States, Indian tribes hold inherent power to try and punish Indians except where otherwise prohibited by Congress). However, "the commonly

shared presumption of Congress . . . [is] that tribal courts do not have the power to try non-Indians [for crimes committed on Indian land]." *Oliphant*, 435 U.S. at 207.

Here, defendant concedes in his brief that he is not a member of an Indian tribe. Trooper Hipp testified that at the time he placed defendant under arrest, he assumed that defendant was non-Indian. Moreover, in its findings of fact regarding defendant's pretrial motion to suppress the trial court noted that "[t]he Court can only assume and take notice that [defendant] is a non-Indian . . . ." As such, whether the trial court would have subject matter jurisdiction over defendant's DWI offense would depend on whether a DWI offense, as defined by section 20 of our General Statutes and the Tribal Code, is a criminal or civil offense.

After defendant blew a 0.15 on his breath test, defendant was charged with DWI. A DWI, as defined by N.C. Gen. Stat. § 20-138.1, is a misdemeanor offense; a misdemeanor offense is a type of criminal offense. *See* N.C.G.S. § 20-138.1(a)(1) (2013) ("A person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State [] [w]hile under the influence of an impairing substance[.]").

Pursuant to Tribal Code § 20-1, "[c]riminal penalties may only be imposed against persons who are subject to the Cherokee court's criminal jurisdiction . . . ." CHEROKEE INDIANS EASTERN BAND, N.C., CODE ch. 20, art. 1, § 20-1. Additionally, the Code requires that a Cherokee magistrate follow specific procedures, known as the "St. Cloud test," to ensure that the Tribal court would have jurisdiction over a defendant. After specific inquiries, "[i]f the Magistrate determines that the defendant is a non-Indian, then the Magistrate shall notify the CIPD (Cherokee Indian Police Department) of same, dismiss the Tribe's charges and turn the defendant over to the CIPD for transport to the appropriate State or local judicial or law enforcement officer or to the Federal authorities." *Id.* § 15, App. A, Cherokee R. Crim. P. 6(b)(1) (2013). Therefore, tribal courts lack jurisdiction over non-Indians. *See Oliphant*, 435 U.S. at 210 ("The power of the United States to try and criminally punish is an important manifestation of the power to restrict personal liberty. By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress." (citation omitted)). As such, the State Highway Patrol had authority over defendant.

Therefore, where the Tribal Code of Ordinances adopted N.C.G.S. Chapter 20 and where the Code further authorizes the State Highway Patrol to enforce North Carolina traffic laws as adopted by the Eastern Band of the Cherokee Indians, the trial court did not err in exercising subject matter jurisdiction over defendant. Defendant's argument is overruled.

*II.*

Defendant next challenges whether the roadblock set-up by the Cherokee Police Department was constitutional.

Defendant first argues that the trial court erred in finding the roadblock constitutional because the State Highway Patrol lacked authority to enforce traffic laws within the Qualla boundary. As we have already determined in *Issue I* that the State Highway Patrol had authority to enforce traffic laws within the Qualla boundary, we need not address this portion of defendant's argument.

Defendant further argues that even if the State Highway Patrol had authority to enforce traffic laws within the Qualla boundary, the trial court erred in finding the roadblock constitutional because the roadblock was improperly conducted. We disagree.

When considering a challenge to a checkpoint, the reviewing court must

undertake a two-part inquiry to determine whether the checkpoint meets constitutional requirements. First, the court must determine the primary programmatic purpose of the checkpoint. . . .

Second, if a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint . . . [the court] must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances.

*State v. Veazey*, 191 N.C. App. 181, 185—86, 662 S.E.2d 683, 686—87 (2008) (internal quotations and citations omitted).

The State, in arguing that the roadblock was constitutional, presented testimony from Cherokee Officers Wright and Teesateskie and State Highway Patrol Trooper Hipp that the roadblock was one of two established near the rally. Each roadblock was set-up to check all vehicles leaving the rally for potential DWI, driver's license, insurance, and unsafe driving violations. In its findings of fact the trial court determined the roadblock to have a "legitimate primary programmatic purpose," stating that

the design of the procedure of a checkpoint was that each vehicle be stopped. The primary purpose was to see if the license was current, the registration of the vehicle, and any other violation of the law that was then eminently detectable by the officer. Each and every vehicle coming out was checked. There was no selectivity in the process . . . .

As defendant presented no evidence in the record to contradict the State's proffered purpose for the roadblock, the trial court could rely on the testifying police officers' assertions of a legitimate primary purpose. *Id.* at 187, 662 S.E.2d at 687—88.

The trial court must, after finding a legitimate programmatic purpose, determine whether the roadblock was reasonable and, thus, constitutional. "To determine whether a seizure at a checkpoint is reasonable requires a balancing of the public's interest and an individual's privacy interest." *State v. Rose*, 170 N.C. App. 284, 293, 612 S.E.2d 336, 342 (2005) (citation omitted). "In order to make this determination, this Court has required application of the three-prong test set out by the United States Supreme Court in *Brown v. Texas*, 443 U.S. 47, 50, 61 L. Ed. 2d 357, 361, 99 S. Ct. 2637, 2640 (1979)." *State v. Jarrett*, 203 N.C. App. 675, 679, 692 S.E.2d 420, 424—25 (2010) (citation omitted). "Under *Brown*, the trial court must consider [1] the gravity of the public concerns served by the seizure[;] [2] the degree to which the seizure advances the public interest[;] and [3] the severity of the interference with individual liberty." *Id.* at 679, 692 S.E.2d at 425 (citation and quotations omitted).

The first *Brown* factor — the gravity of

> the public concerns served by the seizure — analyzes the importance of the purpose of the checkpoint. This factor is addressed by first identifying the primary programmatic purpose . . . and then assessing the importance of the particular stop to the public.

*Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342 (citation omitted). The trial court, in its findings of fact, noted that the rally "added thousands [sic] people to an already burdening population at that particular time of the year . . . to the Cherokee vicinity," and that "the officers concerned about checking traffic with regard to the users and participants for that rally would [sic] probably certainly [sic] justified and that the Court could almost take notice of the fact that at a Harley Davidson Rally, they're not singing hymns."

When Officer Wright stopped defendant, he did so for the purpose of checking defendant for potential driving violations. After Officer Wright noticed that defendant appeared to be intoxicated and saw two open cans of beer in the truck's center console, he directed defendant to return to the parking lot and requested an available officer to come and assist in a potential DWI investigation. This Court has held that such measures are appropriate under the first prong of *Brown*. *See State v. Nolan*, 211 N.C. App. 109, 712 S.E.2d 279 (2011) (discussing how the

first prong of *Brown* is met where an officer stopped the defendant at a roadblock, detected an odor of alcohol and noticed two missing bottles from a six-pack of beer in the vehicle, and began a DWI investigation); *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690 ("Both the United States Supreme Court as well as our Courts have suggested that 'license and registration checkpoints advance an important purpose[.]' The United States Supreme Court has also noted that states have a 'vital interest' in ensuring compliance with other types of motor vehicle laws that promote public safety on the roads." (citations omitted)).

Under the second *Brown* prong — "the degree to which the seizure advance[d] the public interest" — the trial court must determine whether "[t]he police appropriately tailored their checkpoint stops to fit their primary purpose." *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690 (internal quotation and citation omitted).

> Our Court has previously identified a number of non-exclusive factors that courts should consider when determining whether a checkpoint is appropriately tailored, including: whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or

> ending time; and whether police offered any reason why that particular time span was selected.

*Id.*

Here, the trial court made findings of fact indicating that there was a written plan and guidelines set by the Cherokee police department for conducting roadblocks at the rally; a briefing on this plan and guidelines was held for all officers and troopers assisting at the rally; two roadblocks were set up at previously designated points to address traffic leaving the rally; the roadblocks had specific start and end times to coincide with the conclusion of the rally; and both police cruisers and fire trucks were placed at the roadblocks with their lights flashing to indicate to drivers that roadblocks were being conducted. Such findings "do indicate that the trial court considered appropriate factors to determine whether the checkpoint was sufficiently tailored to fit its primary purpose, satisfying the second *Brown* prong." *Jarrett*, 203 N.C. App. at 680—81, 692 S.E.2d at 425.

"The final *Brown* factor to be considered is the severity of the interference with individual liberty." *Id.* at 681, 692 S.E.2d at 425. "[C]ourts have consistently required restrictions on the discretion of the officers conducting the

checkpoint to ensure that the intrusion on individual liberty is no greater than is necessary to achieve the checkpoint's objectives." *Veazey,* 191 N.C. App. at 192—93, 662 S.E.2d at 690—91.

> Courts have previously identified a number of non-exclusive factors relevant to officer discretion and individual privacy, including: the checkpoint's potential interference with legitimate traffic[]; whether police took steps to put drivers on notice of an approaching checkpoint[]; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field[]; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern[]; whether drivers could see visible signs of the officers' authority[]; whether police operated the checkpoint pursuant to any oral or written guidelines[]; whether the officers were subject to any form of supervision[]; and whether the officers received permission from their supervising officer to conduct the checkpoint[.]

*Id.* at 193, 662 S.E.2d at 691 (citations omitted). "Our Court has held that these and other factors are not 'lynchpin[s],' but instead [are] circumstance[s] to be considered as part of the totality of the circumstances in examining the reasonableness of a checkpoint." *Id.* (internal quotations and citation omitted).

The trial court's findings of fact, which were supported by the testimony of Officers Wright and Teesateskie and Trooper

Hipp, found "there was in place a policy for checkpoints to be established by local police as well as assistance from the North Carolina State Highway Patrol, [for] which assistance was solicited by the Cherokee Police Department"; "the local Cherokee Police Department decided to establish two checkpoints that are random, they don't do it regularly at either one of those places"; and that "there [was] a policy, at that time, in writing, . . . [but] that their office . . . moved twice, and whatever document existed then no longer exists now." As for the policy, the trial court further noted that "the design of the procedure of a checkpoint was that each vehicle be stopped"; "[t]he primary purpose was to see if the license was current, the registration of the vehicle, and any other violation of the law that was then eminently detectable by the officer"; and that"[e]ach and every vehicle coming out was checked . . . [t]here was no selectivity in the process." In its conclusions of law, the trial court stated that "the Court finds that those facts support the propriety of the stop and the measure of it and the substance of it based thereon, [and] the motion to suppress the stop and any information obtained as a result thereof in regard to this defendant is denied." As the trial court properly determined that the roadblock had a legitimate

programmatic purpose and that the *Brown* factors were met, defendant's argument is accordingly overruled.

*III.*

Defendant's final argument on appeal is that the trial court erred in failing to grant defendant's *Knoll* motion to dismiss the DWI citation. We disagree.

A *Knoll* motion, based on *State v. Knoll,* 322 N.C. 535, 369 S.E.2d 558 (1988), alleges that a magistrate has failed to inform a defendant of the charges against him, his right to communicate with counsel, family, and friends, and of the general circumstances under which he may secure his release pursuant to N.C. Gen. Stat. § 15A-511. *See* N.C.G.S. § 15A-511(b) (2013); *Knoll,* 322 N.C. at 536, 369 S.E.2d at 559 ("Upon a defendant's arrest for DWI, the magistrate is obligated to inform him of the charges against him, of his right to communicate with counsel and friends, and of the general circumstances under which he may secure his release."). If a defendant is denied these rights, the charges are subject to being dismissed. *Knoll*, 322 N.C. at 544, 369 S.E.2d at 564. On appeal, the standard of review is whether there is competent evidence to support the trial court's findings and the conclusions. *State v. Chamberlain*, 307 N.C. 130, 143, 297 S.E.2d

540, 548 (1982) (citation omitted). "If there is a conflict between the state's evidence and defendant's evidence on material facts, it is the duty of the trial court to resolve the conflict and such resolution will not be disturbed on appeal." *Id.*

Defendant raised his *Knoll* motion during the pretrial hearing, arguing that the magistrate failed to promptly release him after his arrest. Defendant appeared before the magistrate at 1:05 a.m., and was released from jail after posting bond at 4:50 a.m. In making his *Knoll* motion, defendant contends that the magistrate violated his rights to a timely pretrial release by setting a $500.00 bond and holding him in jail for approximately three hours and 50 minutes. Defendant's argument is without merit. Pursuant to our standard of review, the trial court properly denied defendant's *Knoll* motion.

> In determining which conditions of release to impose, the judicial official must, on the basis of available information, take into account the nature and circumstances of the offense charged; the weight of the evidence against the defendant; the defendant's family ties, employment, financial resources, character, and mental condition; whether the defendant is intoxicated to such a degree that he would be endangered by being released without supervision; the length of his residence in the community; his record of convictions; his history of flight to avoid

prosecution or failure to appear at court proceedings; and any other evidence relevant to the issue of pretrial release.

N.C. Gen. Stat. § 15A-534(c) (2013). "If the provisions of the . . . pretrial release statutes are not complied with by the magistrate, *and* the defendant can show irreparable prejudice directly resulting from [this noncompliance**]**, the DWI charge must be dismissed." *State v. Labinski*, 188 N.C. App. 120, 126, 654 S.E.2d 740, 744 (2008) (citation omitted).

During the pretrial hearing, defendant presented evidence in support of his Knoll motion that the magistrate failed to promptly release him. The State disputed this evidence in its response. In denying defendant's motion, the trial court made the following findings of fact and conclusions of law:

> The defendant was arrested at or about 10:30 p.m., was referred to a trooper, was taken to the jail in Swain County, and test administered on or about -- wait, let's see -- it was 12:34. Then he was released at approximately 4:50 a.m., after making bond. The magistrate upon receiving notification from the trooper that the breathalyser [sic] has registered in both tests .15, knowing that the defendant was a non-resident, the magistrate also opined that upon observing the defendant, he was, and I quote, "pretty drunk," end of quote.

> Furthermore, that the magistrate was under an obligation not to turn him out in the public in that kind of condition notwithstanding the defendant's assertion

that a breathalyser [sic] test is not accurate, and he wanted a blood test to show that. The Court further finds the magistrate did not deny him any rights by setting a bond, and the bond he made, albeit some four hours later. In any event, due to those circumstances the Court finds that his rights have not been violated.

There's no prejudice shown to it, especially due to the fact that when he was released, he was in the company of a bondsman or bonds-lady, eventually back to the cabin where his then girlfriend, now wife, was. Either one of those ladies, either one could have helped him or assisted him in getting to a hospital to get a blood test. And if in the event I do take notice of alcohol dissipating from the body at .16 per hour, then extrapolating forward or at least backwards at the time he was arrested he had a .18. Now, going forward, had he gone ahead and gotten the blood test when he had a chance to, he still would have been at or near .08, if the breathalyser [sic] was accurate. He had the chance to do so. He hasn't been denied any rights that he could have exercised on his own. Therefore, that motion under the Knoll test is denied.

At the pretrial hearing, defendant testified that the magistrate told him of his right to contact family, friends and counsel; defendant could not recall if the magistrate told him that he could seek to have an independent chemical analysis done. Defendant also acknowledged that when the magistrate asked if he wanted to contact someone, defendant declared that he did not, and signed the release forms indicating this. Defendant

further testified that he wanted to undergo an independent chemical analysis at the hospital, but that the four hour delay in his release prevented him from doing so. The magistrate testified that he had a "cordial conversation" with defendant, and that defendant was properly informed of his rights pursuant to N.C.G.S. §15A-511(b). The magistrate further testified that defendant was given access to a telephone at the jail where he could have contacted counsel or another person to assist him in obtaining an independent analysis; defendant admitted that he used this telephone to call a bail bondsman. As such, although there was conflicting evidence between defendant and the State as to whether the magistrate erred in his arraignment of defendant, the trial court resolved this conflict by weighing all relevant evidence before concluding that the magistrate did not commit a *Knoll* violation. *See State v. Lewis*, 147 N.C. App. 274, 279, 555 S.E.2d 348, 351 (2001) ("At the hearing on the *Knoll* motion, the defendant stipulated that Magistrate Alexander informed him of his right to communicate with counsel, family, and friends. The defendant testified that he was given a telephone and he attempted to make calls. Although there was conflicting evidence, the trial court found the defendant was informed of his rights by Trooper Jackson and Magistrate

Alexander. Further, it found that the defendant was given the opportunity to exercise those rights but he failed to do so. The findings of the trial court support its conclusions. Thus, the trial court did not err in denying the motion to dismiss.").

Defendant further argues that the magistrate erred in his arraignment by also charging defendant with carrying a concealed weapon. During Trooper Hipp's investigation defendant admitted that he had a handgun in his truck. Although defendant had a permit for the handgun issued in South Carolina, defendant did not produce this permit until his trial at which time the charge was dismissed. As such, the magistrate was unaware of defendant's handgun permit at the time defendant was brought before him.

In determining whether to hold defendant under bond, the magistrate testified that he considered all relevant circumstances surrounding defendant pursuant to N.C.G.S. § 15A-534(c). The magistrate stated that he set defendant's bond at $500.00 because defendant was, based on the chemical analysis, "pretty drunk," defendant was from out-of-state and therefore "[i]t's very common to ask for some kind of a secured bond when people are not from this area[,]" and because defendant had a firearm on him at the time of his arrest. The magistrate then

acknowledged that had he known defendant had a South Carolina permit for the handgun, he "would not have charged him with that because we honor South Carolina permits." Therefore, as the magistrate made his decision as to defendant's bond by considering all of the evidence before him, the magistrate did not err in charging defendant for carrying a concealed weapon. Furthermore, even if the magistrate erred in considering defendant's handgun in determining defendant's bond, such error was not prejudicial. In its conclusions of law denying defendant's *Knoll* motion, the trial court noted that

> [t]here's no prejudice shown . . . . And if in the event I do take notice of alcohol dissipating from the body at .16 per hour, then extrapolating forward or at least backwards at the time he was arrested he had a .18. Now, going forward, had he gone ahead and gotten the blood test when he had a chance to, he still would have been at or near .08, if the breathalyser was accurate.

As such, the trial court specifically found that the magistrate's processing of defendant was not prejudicial because defendant was so intoxicated that his length of detention and bond amount was thus proper. *See Labinski*, 188 N.C. App. 120, 654 S.E.2d 740 (finding no prejudicial error where the defendant was arrested for DWI, blew at 0.08, was assigned a $500.00 bond, and was held in the jail for over two hours until she posted

bond, despite the magistrate failing to determine whether the defendant would pose a threat if released "under conditions other than a secured bond"). Accordingly, defendant's final argument on appeal is overruled.

The State's motion to dismiss is denied. The trial court's denial of defendant's pretrial motions is affirmed.

Judges CALABRIA and GEER concur.